## STATE OF CONNECTICUT *v.* IRA ALSTON
(SC 16910)

Norcott, Katz, Vertefeuille, Zarella and Scheinblum, Js.

434

Argued October 21, 2004—officially released January 11, 2005

*Damon Kirschbaum*, with whom, on the brief, were *Felix Esposito* and *Jennifer Vickery*, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Michael Dearington*, state's attorney, and, on the brief, *John Waddock*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Ira Alston, was convicted, after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a, and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The trial court sentenced the defendant to a total effective term of thirty-five years imprisonment. The defendant appealed from the trial court's judgment to this court pursuant

to General Statutes § 51-199 (b) (3).[1] On appeal, the defendant claims that the state violated his federal constitutional right to remain silent following his receipt of *Miranda*[2] warnings by making references to his invocation of that right during testimony at trial, as well as during closing arguments, in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The defendant also claims that the trial court improperly: (1) instructed the jury regarding consciousness of guilt and burden of proof; (2) failed to conduct a substantive inquiry into an allegation of juror misconduct; and (3) violated General Statutes § 54-82h when it replaced an excused juror with the next alternate juror selected. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On December 8, 1999, the defendant was standing in the hallway of his apartment complex on the corner of Sherman Avenue and Elm Street in New Haven when Bobby Bloodworth, a fellow high school student, stopped by to visit Sohanna Early, a friend who lived in the complex. When Bloodworth emerged from Early's apartment, he saw the defendant in the courtyard and talked to him briefly before leaving. As Bloodworth walked away from the courtyard, he saw two men approach on foot and a red car pull up to the curb. Anthony Tolliver, the victim, exited the car and jumped onto the short brick wall bordering the courtyard. The victim previously had purchased drugs from various

---

[1] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

Manslaughter in the first degree with a firearm is a class B felony with a maximum sentence of not more than forty years. See General Statutes § 53a-35a (4).

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

dealers in the building, including the defendant. After hearing the victim jump down off the wall and footsteps coming up behind him, Bloodworth turned around and saw the defendant fire two shots, one of which struck the victim in the chest. Bloodworth immediately fled the scene. The victim, meanwhile, died on the pavement.

The next day, Detective John Velleca of the New Haven police department was called to Hillhouse High School because students were discussing the shooting. On the basis of his investigation there, Velleca attempted to find the defendant and Bloodworth for questioning.

Velleca first located the defendant, who was in custody on unrelated charges. After being advised of his *Miranda* rights, the defendant signed a waiver of rights form and agreed to talk to the police. The defendant proceeded to give statements to the police that, at trial, he subsequently admitted were lies. The defendant told the police that he was not in the vicinity of the shooting on the night in question, but instead he was with a friend named Iona. He denied being involved in any drug dealing, and he claimed that he had never seen the victim before. He also described his clothing on the night of the shooting as consisting of a grey sweatsuit and black boots. All of these statements conflicted with the defendant's subsequent trial testimony. At no point during the interview did the defendant implicate Bloodworth as the shooter.

The police department investigated the defendant's alibi and found that it could not be corroborated. The police then confronted the defendant with this information. At that point, according to Velleca's testimony, the defendant terminated the interview.[3] Thereafter, he was released.

---

[3] The defendant's testimony at trial conflicted with Velleca's recollection of the interview on this crucial point. According to the defendant, he never was confronted with information about his alibi and he never terminated the interview, as Velleca had suggested. To the contrary, the defendant

Velleca subsequently located Bloodworth and brought him to the police station for questioning. Bloodworth was frightened and crying, and immediately asked to be enrolled in a witness protection program. He thereafter gave a tape-recorded statement about the shooting and identified the defendant as the shooter from a photoboard. Several days later, on December 13, 1999, the defendant was arrested in connection with the shooting.

At trial, Bloodworth, an admitted drug dealer, testified against the defendant. He indicated that, shortly after the shooting, the defendant paged him and asked him whether he had told anyone about the incident. Early similarly testified at trial about the events surrounding the shooting. Although she did not implicate the defendant as the shooter, since she had not witnessed the homicide, she testified that the defendant's reaction to what had transpired was, "Shit happens."

Additionally, several other acquaintances of the defendant testified that they had seen him with a weapon in the days leading up to the shooting. Tyrone Figgs testified that he had seen the defendant with a .38 special revolver three days before the shooting. This was supported by the testimony of another witness, Angel Rich, who saw the defendant carrying a gun one

claims that the police simply did not ask him any further questions. The following is an excerpt from the state's cross-examination of the defendant with respect to this issue:

"[State's Attorney]: And, in fact, Mr. Alston, when police officers went to check on your alibi or your claims as to where you had been, and at one time you had been there, they came back and told you that that was not accurate, didn't they?

"[The Defendant]: Well, actually no, they didn't tell me that. They, when they came back they just brought me downstairs.

"[State's Attorney]: They never indicated to you that they checked out your story and that it proved false?

"[The Defendant]: No, they ain't never tell me that.

"[State's Attorney]: Never said that to you?

"[The Defendant]: No, they didn't."

week before the shooting. Although Rich was not sufficiently familiar with guns to describe the specific caliber of the weapon, her physical description of the gun was consistent with Figgs' testimony. Their testimony also was consistent with the state's firearms expert who testified that the bullet that struck and killed the victim likely was fired by either a .357 magnum revolver or a .38 special revolver, both of which have a similar silver appearance.

The defendant thereafter testified that the story he had given to police when he was first taken into custody on December 9, 1999, was entirely false. His testimony at trial implicated Bloodworth as the shooter. Specifically, the defendant testified that Bloodworth was in the business of selling drugs along with an acquaintance by the name of Drew, and that, on the day of the shooting, he was playing the role of armed lookout when the victim approached and jumped onto the wall. The defendant admitted that he did not see Bloodworth actually shoot the victim, but he saw Bloodworth pull out a gun and raise it immediately before the defendant heard shots fired. The defendant further testified that he was merely an innocent bystander trying to leave the scene in order to get dinner when the homicide occurred. Thereafter, the jury convicted the defendant of manslaughter in the first degree with a firearm and carrying a pistol without a permit, and the trial court sentenced him to thirty-five years imprisonment on the first count and a concurrent three year term of imprisonment for the second, for a total effective sentence of thirty-five years imprisonment. Additional facts will be set forth as necessary in the context of the defendant's specific claims on appeal.

## I

## WHETHER THE STATE'S REFERENCES TO THE DEFENDANT'S POST-*MIRANDA* SILENCE VIOLATED *DOYLE*

The defendant's first claim on appeal is that the state violated his federal constitutional right to remain silent following his receipt of *Miranda* warnings by making repeated references to his invocation of that right during testimony at trial as well as during closing argument. The defendant argues that these violations were not harmless beyond a reasonable doubt and deprived him of a fair trial. Specifically, the defendant contends that the United States Supreme Court's holding in *Doyle* v. *Ohio*, supra, 426 U.S. 618–19, that post-*Miranda* silence cannot be used to impeach a defendant or as affirmative proof of guilt, was violated when: (1) the trial court admitted testimony suggesting that the defendant invoked his right to silence in direct response to the police confronting him about the discrepancies in his statements about his alibi; (2) the state impeached the defendant with questions about his post-*Miranda* failure to implicate Bloodworth; and (3) the state, during closing argument, emphasized the defendant's failure to relay to the police the version of events he testified to at trial. The state claims, in response, that: (1) this claim is unreviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because the record is inadequate with respect to whether the defendant asserted his right to silence; (2) there was no *Doyle* violation because the defendant waived his right to remain silent; and (3) any possible *Doyle* violation was harmless beyond a reasonable doubt. We agree with the state insofar as we conclude that there was no *Doyle* violation. We will address each of the defendant's specific claims of error in turn.

Preliminarily, we note that the defendant failed to preserve this claim at trial. Accordingly, he now seeks

review under *State* v. *Golding,* supra, 213 Conn. 239–40. Although there is conflicting evidence on the issue of whether the defendant asserted his right to remain silent,[4] we conclude that the alleged improprieties are not *Doyle* violations.

In *Doyle* v. *Ohio,* supra, 426 U.S. 619, the United States Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment." "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." *Wainwright* v. *Greenfield,* 474 U.S. 284, 292, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). "As such, silence following *Miranda* warnings is insolubly ambiguous because it may constitute a reliance upon those rights rather than a tacit admission that the accused has an insufficient defense or explanation for his conduct." (Internal quotation marks omitted.) *State*

[4] During trial, there was conflicting testimony regarding whether the defendant asserted his right to remain silent. Detective Velleca testified that the defendant had terminated his interview with police after having been confronted with unfavorable information about his alibi. This constitutes a recognized assertion of the right to silence. The defendant, however, thereafter denied that he had terminated the interview, and testified that the police simply did not ask him any further questions; see footnote 3 of this opinion; which suggests that the defendant never asserted the right. This conflicting testimony is the only evidence regarding the defendant's assertion of his right to silence in the record, and there was no accompanying fact finding. On appeal, the defendant now claims that after initially having waived his right to silence, he reasserted it during his interview with police, making the state's reference to it at trial a *Doyle* violation. This is an important issue because if the defendant had never asserted his right to silence, the state's reference to it was not improper. See *State* v. *Correa,* 241 Conn. 322, 360 n.24, 696 A.2d 944 (1997) ("it is well established that the principle of *Doyle* . . . is not violated in situations . . . where the defendant has chosen not to remain silent" [citation omitted]). The record in the present case, however, is ambiguous.

v. *Berube,* 256 Conn. 742, 752–53, 775 A.2d 966 (2001), quoting *State* v. *Talton,* 197 Conn. 280, 295, 497 A.2d 35 (1985). "References to one's invocation of the right to remain silent [are] not always constitutionally impermissible, however." (Internal quotation marks omitted.) *State* v. *Casey,* 201 Conn. 174, 183, 513 A.2d 1183 (1986). We have allowed them "in certain limited and exceptional circumstances." *State* v. *Montgomery,* 254 Conn. 694, 716–17 n.30, 759 A.2d 995 (2000).

## A

The defendant first claims that the trial court violated *Doyle* by improperly permitting the state to present evidence that he had terminated an interview with police in response to information that his alibi was false. Specifically, the defendant claims that the following exchange during direct examination between the state and its witness, Detective Velleca, was improper:

"[State's Attorney]: Did you confront [the defendant] with that information [that his alibi's story conflicted with his story]?

"[Velleca]: I did.

"[State's Attorney]: What, if anything, did he do at that time?

"[Velleca]: He terminated the interview."

The defendant did not object to this line of questioning at trial. The defendant now claims, however, that the introduction of such evidence improperly imposed a penalty upon him for invoking his right to silence in contravention of *Doyle.* We disagree.

These facts are similar to the facts in *State* v. *Casey,* supra, 201 Conn. 182–83, in which the defendant initially voluntarily spoke to the police regarding his participation in a homicide, and thereafter abruptly terminated the interview. In *Casey,* as in the present case, the state

elicited testimony regarding the defendant's invocation of his right to remain silent from a detective at trial in the course of questioning regarding his investigation of the crime. Id., 182. This court held that the testimony had been offered for the permissible purpose of relaying "the sequence of events as they unfolded . . . ." Id., 183. Similarly, we conclude that the exchange in the present case was proper because it merely described the investigative efforts of police. Accordingly, there was no *Doyle* violation.

## B

The defendant next claims that the state violated *Doyle* when it referred to the defendant's post-*Miranda* silence during its cross-examination of the defendant at trial. Specifically, the defendant objects to the following colloquy concerning the December 9, 1999 interrogation of the defendant:

"[State's Attorney]: And at no time, and you're certain of that, at no time did you ever tell police officers that night or any other night that you had seen Bobby Bloodworth raise up a gun out of his pants and then hear shots shortly thereafter, did you?

"[The Defendant]: No, I did not.

"[State's Attorney]: You never told police that night or any night thereafter about having met Bobby Bloodworth on the street in the cars later that night, did you?

"[The Defendant]: No, I did not.

"[State's Attorney]: You never told police that night or any other night about your claim that supposedly Bobby Bloodworth contacted you and told you supposedly that to keep your mouth shut, did you?

"[The Defendant]: Never told police nothing about that."

We note, once again, that the defendant did not object to these questions at trial, but now claims that the impeachment was improper because it referenced his failure to mention Bloodworth, the person he testified was the real shooter, to police, both during his initial interview and after the defendant had terminated the interview. We disagree with the defendant.

We conclude that the challenged references fall within the exception to *Doyle* articulated in *Anderson* v. *Charles*, 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980). In *Anderson*, the United States Supreme Court held that "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." Id. The court in *Anderson* held impeachment on a prior inconsistent statement[5] to be proper because "[t]he quoted colloquy, taken as a whole, [did] not refe[r] to the [defendant's] exercise of his right to remain silent; rather [it asked] the [defendant] why, if [his trial testi-

---

[5] The following is the relevant portion of the colloquy between the state and the defendant in *Anderson* v. *Charles*, supra, 447 U.S. 405–406, which the court concluded was proper:

"Q. And, you have had plenty of opportunity to look out that window and see the bus station and Kelly's Tire?

"A. That's right.

"Q. And, you've seen cars being parked there, isn't that right?

"A. That's correct.

"Q. Is this where you got the idea to come up with the story that you took a car from that location?

"A. No, the reason I came up with that is because it's the truth.

"Q. It's the truth?

"A. That's right.

"Q. Don't you think it's rather odd that if it were the truth that you didn't come forward and tell anybody at the time you were arrested, where you got that car?" (Internal quotation marks omitted.)

mony] were true, he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street." (Internal quotation marks omitted.) Id., 408–409. Essentially, the court concluded that the impeachment questions were proper because they were not intended to attach meaning to silence, "but to elicit an explanation for a prior inconsistent statement." Id., 409. "Where [a] defendant elects to speak to the police and gives statements that he later contradicts at trial, a prosecutor's inquiry into the defendant's failure to give the exculpatory account before trial does not draw a negative inference from the defendant's decision to remain silent but rather from his prior inconsistent statement." *United States* v. *Donnat*, 311 F.3d 99, 104–105 (1st Cir. 2002).

Likewise, the challenged colloquy in the present case refers to a prior inconsistent statement voluntarily made by the defendant to the police. During his December 9, 1999 interview with police, the defendant stated that he could not confirm or deny reports of a shooting in his neighborhood because he was not in the area; essentially, he knew nothing about the shooting. At trial, however, the defendant changed his testimony on this subject and implicated Bloodworth in the shooting death of the victim. Accordingly, pursuant to *Anderson*, the state properly could question the defendant on this point for the limited purpose of eliciting an explanation for his prior inconsistent statement.[6] There was no *Doyle* violation.[7]

---

[6] We do not find any merit in the defendant's unsupported contention in his reply brief that the present case substantively differs from *Anderson* because the challenged statements were designed to serve as affirmative evidence of the defendant's guilt instead of eliciting an explanation for an inconsistency.

[7] In his brief, the defendant mentions that the language, " 'at no time' " and " 'or any other night thereafter' " in the challenged colloquy in the present case "is closely analogous to the phrase, 'at some point,' which was found to be improper in *State* v. *Esposito*, 223 Conn. 299, 613 A.2d 242 (1992) . . . ." In *Esposito*, the court simply cautioned that such language might be understood as making an improper reference and, therefore,

## C

The defendant's final claim under *Doyle* is that the state's attorney's references during closing argument to the defendant's failure to mention Bloodworth before trial were improper. Specifically, the defendant challenges the following comments:

"[State's Attorney]: . . . And don't you think, ladies and gentlemen, that if the defendant really was telling you the truth, that back in December 9th, 1999, when confronted with an accusation that, hey, we're investigating the murder of somebody, where were you? And you give a phony alibi, and you come back and say, hey, that's not the truth. But you're going to take the weight for somebody. Why isn't he—why didn't he tell the police at that point in time Bobby Bloodworth was the guy who did the shooting, not me? Why didn't he tell when he was arrested on December 13th, 1999, Bobby Bloodworth did the shooting? Don't lay it on me. Doesn't it offend your common sense to suggest that he has waited all this time—

"[Defense Counsel]: I'm going to object to that, Your Honor. That is absolutely improper about when he made disclosures to other people that are not a part of this case.

"The Court: Sustained. Disregard that argument. It has no weight or application in this case.

"[State's Attorney]: [The defendant] told you that after December 9th and December 13th, he never told any police officers in connection with this case that Bobby Bloodworth was involved."

advised the trial court not to allow it on remand; id., 319–20; it was not, however, the basis for the reversal of the defendant's conviction. Id., 313. Additionally, in *Esposito*, this court did not consider *Anderson* v. *Charles*, supra, 447 U.S. 404, which we now consider in the present case.

The defendant contends that these comments deprived him of a fair trial. We disagree.

As we previously stated, "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements . . . [because] [s]uch questioning makes no unfair use of silence . . . ." *Anderson* v. *Charles*, supra, 447 U.S. 408. In *State* v. *Casey*, supra, 201 Conn. 185, this court held that prosecutorial comment during closing argument is analogous to prosecutorial comment during cross-examination for the purpose of the application of this rule. As all of the objectionable references during closing argument concerned the defendant's prior inconsistent statement, namely, that he knew nothing about the shooting, they did not constitute a *Doyle* violation.[8]

Moreover, we note that the trial court sustained an objection to the comments and immediately instructed the jury to disregard them. "In the absence of any indication to the contrary, we presume that the jury followed the court's instruction." *State* v. *Reynolds*, 264 Conn. 1, 141, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Accordingly, even if a violation had occurred, it likely would have been mitigated by this jury instruction.

## II

### WHETHER THE TRIAL COURT'S JURY INSTRUCTIONS DILUTED THE STATE'S BURDEN OF PROOF

The defendant next claims that certain of the trial court's instructions to the jury improperly diluted the

---

[8] The defendant identifies another reference made during the state's closing argument that, he contends, improperly refers to his post-*Miranda* silence: "And if [the] defendant's claim about he hasn't had a chance to—or he hasn't been able to stop thinking about it since that time, ask yourself why didn't he tell the police at that time about the 13th?" Like the other challenged comments, this statement makes reference to the defendant's prior inconsistent statement. It is therefore not a *Doyle* violation pursuant to the rule articulated in *State* v. *Casey*, supra, 201 Conn. 185.

state's burden of proving the defendant guilty beyond a reasonable doubt and, in the case of the first instruction, burdened the defendant's constitutional right to testify. We disagree.

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts." (Internal quotation marks omitted.) *State* v. *Romero*, 269 Conn. 481, 488, 849 A.2d 760 (2004). "The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [It should] not [be] critically dissected in a microscopic search for possible error." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360–61, 857 A.2d 808 (2004). "In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial. . . . Moreover, as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Romero*, supra, 488. Under the second prong, "[u]npreserved nonconstitutional claims . . . do not warrant special consideration simply because they bear a constitutional label." (Internal quotation marks omitted.) *State* v. *Adams*, 225 Conn. 270, 289–90, 623 A.2d 42 (1993).

A

The defendant first claims that the trial court improperly instructed the jury that "in addition to considering the defendant's false statements as 'circumstantial evidence of [his] consciousness of guilt,' it could actually

'*use them as independent evidence of his guilt of the crime charged.*' " (Emphasis in original.) Specifically, the defendant contends that the instruction was improper because: (1) instructions permitting a jury to use its disbelief of a defendant's testimony as direct evidence of guilt are improper; and (2) this error was not harmless beyond a reasonable doubt. The state contends, in response, that the trial court's instruction was proper because it concerned a permissive inference, which does not rise to the level of a constitutional claim.[9] We note that the defendant failed to preserve this claim, but nonetheless seeks appellate review pursuant to *State* v. *Golding,* supra, 213 Conn. 239–40. Although the record is adequate for review, we conclude that the claim is not reviewable under *Golding* because it is not of constitutional magnitude.

This court previously has recognized that unpreserved challenges to jury instructions that *mandate* inferences "adverse to a defendant may sufficiently implicate constitutional rights to satisfy the second condition" of *Golding. State* v. *Smith,* 219 Conn. 160, 165, 592 A.2d 382 (1991). By contrast, instructions addressing *permissive* inferences are not of constitutional magnitude. Id., 165–66. The trial court's instruction to the jury in the present case stated that "you are permitted, but you are not required to conclude that such statements are circumstantial evidence of consciousness of guilt. And if you chose, you may use them as independent evidence of his guilt of the crime charged." This was a permissive instruction. In it, the trial court merely outlined the inferential steps that a jury was permitted to make with respect to consciousness of guilt, namely: "(1) from behavior to [false testimony]; (2) from [false testimony] to consciousness of

---

[9] In the alternative, the state also claims that even if the instruction was improper, it was harmless error because, in the context of the entire jury charge, it is not reasonably possible that the jury was misled by it.

guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." (Internal quotation marks omitted.) *State* v. *Scott*, 270 Conn. 92, 105, 851 A.2d 291 (2004). Accordingly, this claim is not reviewable.[10]

## B

The defendant next claims that the trial court improperly instructed the jury that the actual outcome of the case was secondary to its obligation to give both parties a fair trial.[11] Specifically, the defendant claims that the preliminary instruction reduced the state's burden of proving the defendant guilty beyond a reasonable doubt by "shifting the jury's focus away from its sole . . . function, i.e., to act as a critical 'check' against the arbitrary and oppressive exercise of governmental power . . . ." In response, the state contends that this unpreserved claim fails to raise a constitutional violation because the trial court's final jury instructions regarding the state's burden of proof were thorough and proper. The defendant again seeks review of this unpreserved claim pursuant to *Golding*. Although the claim is reviewable, we agree with the state that it is not a constitutional violation.

In *State* v. *Lewis*, 220 Conn. 602, 614, 600 A.2d 1330 (1991), this court held that the significant factor in

___

[10] Although we decline to review this claim, we note that the instruction challenged in the present case previously has been upheld by this court, namely: "[I]f you find that the defendant's acts or flights showed consciousness of guilt, you may use that conclusion or inference as independent evidence of guilt . . . ." (Internal quotation marks omitted.) *State* v. *Groomes*, 232 Conn. 455, 473–74, 656 A.2d 646 (1995).

[11] The defendant objects to the following language that was communicated to every jury panel prior to conducting voir dire: "It's my job, my obligation, just like yours, to give both sides an absolutely fair trial. If we both meet that responsibility the actual outcome of the case is secondary."

determining whether preliminary instructions warrant reversal is whether the jury in a particular case "was fully and properly instructed at the critical time, after all the evidence and after the arguments of counsel." (Internal quotation marks omitted.) Even in cases wherein the preliminary instructions were held to be incomplete and improvidently timed, we have not found reversible error where the final jury instructions were complete and appropriate. See *State* v. *Webb*, 238 Conn. 389, 458, 680 A.2d 147 (1996); *State* v. *Figueroa*, 235 Conn. 145, 184–85, 665 A.2d 63 (1995); *State* v. *Marra*, 222 Conn. 506, 537, 610 A.2d 1113 (1992).

We are not persuaded that the trial court's preliminary instruction to the jury in the present case reduced the state's burden of proof. To the contrary, it likely focused the potential jurors on critically, but impartially, analyzing the evidence presented by both parties, which is crucial to determining whether the state met its burden of proof, instead of taking a result-oriented approach that easily could have been improperly influenced by preconceived opinions. Moreover, even if we were to assume, arguendo, that the instructions initially had misled the jury in some way, this was cured by the trial court's lengthy and accurate final instructions on the state's burden of proof. There was no constitutional violation.

C

The defendant's final constitutional claim regarding jury instructions is that the trial court improperly diluted the state's burden of proof by making two comments, only one of which was preserved for review on appeal, suggesting that it was the jury's task to decide the guilt or innocence of the defendant.[12] Specifically,

---

[12] The defendant is challenging the following two statements in the jury instructions:

(1) "If you believe that either attorney stated a personal opinion about the guilt or innocence of a defendant or about the credibility of any witness

the defendant objects to this suggestion because, he contends, it improperly focused the jury's attention on whether it thought he was guilty instead of whether the state had met its burden of proving guilt beyond a reasonable doubt. This claim merits little review. In *Williams* v. *Florida*, 399 U.S. 78, 87, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970), the United States Supreme Court explicitly stated that the history of trial by jury reveals "a long tradition . . . of relying on a body of one's peers to determine guilt or innocence as a safeguard against arbitrary law enforcement." Moreover, taken in the context of the entire jury instruction, we conclude that the trial court's reference to the jury deciding "guilt or innocence" reasonably could not have misled the jury, as the trial court subsequently emphasized the fact that the state has the burden to prove beyond a reasonable doubt that the defendant violated the law with respect to each count.

### III

### WHETHER THE TRIAL COURT'S FAILURE TO CONDUCT A SUBSTANTIVE INQUIRY INTO ALLEGATIONS OF JUROR MISCONDUCT VIOLATED THE DEFENDANT'S RIGHT TO A FAIR TRIAL

The defendant next claims that the trial court violated his constitutional right to a fair trial by improperly failing to conduct a substantive inquiry into allegations of potential juror misconduct. Specifically, the defendant contends that the trial court's preliminary inquiry into the relationship between a juror and an individual in the courtroom who she claimed to recognize was insuf-

or evidence, you must disregard such opinion. Those opinions are exclusively yours to make."

(2) "In deciding the guilt or innocence of the accused you should not concern yourself with the punishment to be meted out in the event of a conviction."

ficient. The defendant did not preserve this issue for appeal and therefore seeks review of his constitutional claim pursuant to *Golding.* Although this claim is reviewable under the first two prongs of *Golding,* we conclude that there was no constitutional violation.

The following additional facts are necessary for the resolution of this claim. On the morning of June 26, 2002, before the state called one of its witnesses, the trial court indicated on the record that one of the jurors had informed the clerk that she recognized someone in the audience on the state's side of the courtroom. After conferring with counsel for both parties in chambers, the trial court asked counsel whether they wanted it to conduct further inquiry. Defense counsel asked that the name and relationship of the individual in the audience be placed on the record. After initially objecting, the state's attorney stated for the record that it was his belief that the individual was the sister of the victim. This satisfied everyone, and defense counsel specifically requested that the court make no further inquiry, stating "we'll waive any inquiry by the court into the specifics of that relationship."

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution . . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." (Internal quotation marks omitted.) *State* v. *Centeno,* 259 Conn. 75, 81, 787 A.2d 537 (2002). "It is well established, however, that not every incident of juror misconduct requires a new trial. . . . [D]ue process seeks to assure a defendant a fair trial, not a perfect one. . . . The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror."

(Citations omitted; internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 47, 726 A.2d 513 (1999).

In *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995), we held that any allegation of juror misconduct necessitates, at a minimum, some form of preliminary inquiry on the record. The form and scope of such inquiry is left to the discretion of the trial court based on a consideration of multiple factors, including: (1) the private interest of the defendant; (2) a risk and value assessment of additional procedural safeguards; and (3) the government's interest. See id., 529–30. In outlining these factors, we also acknowledged, however, that "[i]n the proper circumstances, the trial court may discharge its obligation simply by notifying the defendant and the state of the allegations, providing them with an adequate opportunity to respond and stating on the record its reasons for the limited form and scope of the proceedings held." Id., 529.

The trial court's actions in the present case clearly satisfied the preliminary inquiry required by *Brown*. After learning about the alleged misconduct, the trial court, on the record, alerted both parties to it, allowed them to respond and to request a more extensive inquiry, and resolved the issue to their mutual satisfaction.[13] This approach was sufficient because: (1) the defendant explicitly stated that he did not want the trial court to conduct any further inquiry; (2) there was little

---

[13] The defendant relies heavily on *State* v. *Centeno*, supra, 259 Conn. 83, to support his claim that he was denied a fair trial in the present case. *Centeno*, however, is factually distinguishable. In *Centeno*, the trial court did not give the parties any opportunity to respond to the information that the defendant recognized a juror, and continued with sentencing as if nothing had occurred. Id., 79. "[I]t improperly failed to conduct even the most elementary inquiry required to satisfy *Brown*." Id., 82. That omission was particularly prejudicial because the alleged relationship involved a juror and the defendant, whose freedom lay in her hands, rather than a juror and, as in the present case, an individual in the courtroom who may have been the victim's sister.

net value in conducting a hearing with the juror in question because the likelihood of prejudice to the defendant from a juror's recognition of a member of the audience, as opposed to one of the parties or witnesses, was minimal; and (3) additional inquiry would have delayed the trial unnecessarily. We, therefore, conclude that the trial court did not abuse its discretion by conducting a limited inquiry into the allegation of juror misconduct.

Moreover, "[w]here . . . the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." (Internal quotation marks omitted.) *State* v. *Rhodes*, supra, 248 Conn. 47. The defendant has not made any such showing of prejudice in his brief or at oral argument before this court, and we decline to exercise our inherent supervisory powers, as requested by the defendant, to extend this requirement of a preliminary inquiry any further at this point.

IV

WHETHER THE TRIAL COURT'S PROCEDURE FOR REPLACING AN EXCUSED JUROR VIOLATED § 54-82h AND CONSTITUTED PLAIN ERROR

The defendant's final claim is that during jury selection, the trial court improperly substituted an excused juror with the next juror selected instead of temporarily leaving the spot open and subsequently filling it with an alternate chosen by lot, as required by § 54-82h.[14]

---

[14] General Statutes § 54-82h (c) provides in relevant part: "If, at any time, any juror shall, for any reason, become unable to further perform the duty of a juror, the court may excuse such juror and, if any juror is so excused or dies, the court may order that an alternate juror who is designated by lot to be drawn by the clerk shall become a part of the regular panel and the trial or deliberation shall then proceed . . . as though such juror had been a member of the regular panel from the time when the trial or deliberation began. . . ."

Specifically, the defendant contends that he is entitled to a new trial because the procedures set forth in § 54-82h are mandatory, and the trial court committed plain error by not following them. The state, in response, claims that: (1) § 54-82h only applies once a jury already has been completely selected, which it had not been in the present case; and (2) if the trial court's actions were improper, the defendant cannot prevail because (a) he induced the error, and (b) he failed to show prejudice. We agree with the state.

The following additional facts are necessary for the resolution of this claim. On the morning of June 14, 2002, before resuming voir dire to select the twelfth juror, the trial court notified counsel that the eleventh juror had requested to be excused from the case because of domestic problems. Counsel for both parties agreed to excuse him, and the trial court notified counsel that both parties had at least one half of their challenges left. As the excused juror had been the last one chosen, the trial court suggested that counsel could elect either (1) to go in sequence, strike the excused juror, and fill his spot with the next selected juror, or (2) to skip over the eleventh juror, choose the twelfth, and subsequently fill the position by lot from a group of alternates. The decision was left to defense counsel, who indicated that the defendant "would prefer to go forward and just continue selecting the main jurors and then select the alternates and not draw the—draw a main juror by lot." Accordingly, the next juror selected became the eleventh juror on the panel.

"The plain error doctrine has been codified at Practice Book § 60-5, which provides in relevant part that [t]he court may reverse or modify the decision of the trial court if it determines . . . that the decision is . . . erroneous in law. . . . The plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial

court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *LaBrec*, 270 Conn. 548, 559, 854 A.2d 1 (2004).

In the present case, the defendant has failed to make such a showing. Without deciding the issue of whether the trial court properly applied the statute, we conclude that the defendant is not entitled to a new trial because he induced the trial court to take the very actions he now criticizes as erroneous, and he has failed to demonstrate any prejudice resulting therefrom. Ordinarily, actions that are induced by a party cannot be grounds for appealable error; therefore, they do not merit review. *State* v. *Walton*, 227 Conn. 32, 67, 630 A.2d 990 (1993). A defendant may not present unpreserved claims of relief from induced error because review of induced error is not permissible under *Golding*. *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004); *State* v. *Gibson*, 270 Conn. 55, 67, 850 A.2d 1040 (2004) ("[t]o allow [a] defendant to seek reversal [after] . . . his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal" [internal quotation marks omitted]). This court previously has held that the process for selecting and dismissing alternate jurors, including § 54-82h (c), does not implicate constitutional rights. *State* v. *LaBrec*, supra, 270 Conn. 558–59. Indeed, the defendant, in his brief, does not suggest that his constitutional rights were implicated by the alleged violation of § 54-82h (c). Accordingly, as the defendant has failed to demonstrate manifest injustice, he cannot prevail on this claim.

The judgment is affirmed.

In this opinion the other justices concurred.