## STATE OF CONNECTICUT *v.* ARNOLD BELL
### (SC 17864)

Rogers, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

---

Argued May 17—officially released September 11, 2007

*Jeffrey C. Kestenband*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, *Gary Nicholson*, senior assistant state's attorney, and *Kevin Doyle*, assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Arnold Bell, was convicted, after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (5),[1] carrying a pistol without a permit in violation of General Statutes (Rev. to 2001) § 29-35 (a),[2] and criminal possession of a pistol or revolver in violation of General Statutes (Rev. to

---

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[2] General Statutes (Rev. to 2001) § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon one's person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

2001) § 53a-217c (a) (1).[3] After further findings by the jury on a second part of the criminal information and a subsequent hearing by the court, the trial court enhanced the defendant's sentence for being a persistent dangerous felony offender in violation of General Statutes § 53a-40 (a) and (h),[4] and for committing a class B felony with a firearm in violation of General Statutes § 53-202k.[5] The defendant then appealed from

[3] General Statutes (Rev. to 2001) § 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony . . . ."

[4] General Statutes § 53a-40 provides in relevant part: "(a) A persistent dangerous felony offender is a person who:

"(1) (A) Stands convicted of manslaughter, arson, kidnapping, robbery in the first or second degree, or assault in the first degree, and (B) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution, for any of the following crimes: (i) The crimes enumerated in subparagraph (A) of this subdivision or an attempt to commit any of said crimes . . . .

"(h) When any person has been found to be a persistent dangerous felony offender, and the court is of the opinion that such person's history and character and the nature and circumstances of such person's criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest, the court, in lieu of imposing the sentence of imprisonment authorized by section 53a-35 for the crime of which such person presently stands convicted, or authorized by section 53a-35a if the crime of which such person presently stands convicted was committed on or after July 1, 1981, shall sentence such person to a term of imprisonment of not more than forty years and, if such person has, at separate times prior to the commission of the present crime, been twice convicted of and imprisoned for any of the crimes enumerated in subdivision (2) of subsection (a) of this section, sentence such person to a term of imprisonment of not more than life. . . ."

Although subsection (d) of § 53a-40 was amended by Public Acts 2001, No. 01-84, § 18, that subsection is not relevant here. For purposes of convenience, we refer to the current revision of the statute.

[5] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall

the judgment of conviction. The defendant claims that certain prosecutorial improprieties deprived him of a fair trial. He further claims that his sentence enhancement as a persistent dangerous felony offender violated his sixth amendment right to a trial by jury, because a finding that was a necessary predicate to the enhancement was made by the trial court, rather than by the jury, which should have made that finding beyond a reasonable doubt. Specifically, the issue we must determine is whether the trial court violated the dictates of *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and its progeny when it imposed the sentence enhancement after its determination "that [the defendant's] history and character and the nature and circumstances of [his] criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest . . . ." General Statutes § 53a-40 (h). We reverse the judgment in part and remand the case for a new sentencing proceeding.

The jury reasonably could have found the following facts. On June 13, 2002, at approximately 9 p.m., Melanie Buckenjohn noticed a black male dressed in army fatigues, later identified as the defendant, loitering outside of the multifamily house she owned on Washington Avenue in the Hill section of New Haven. She walked outside and asked the defendant to leave her property, and he complied by walking to the street. Buckenjohn went back into the house and then pointed the defendant out to one of her tenants, Edeen Bass, and asked Bass to go speak to the defendant to ensure that he was not trying to break into Buckenjohn's car. Bass went outside and encountered the defendant and another black man wearing a white T-shirt, later identified as Gregory Hughes, a friend of the defendant. Bass

---

be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

noticed that the defendant was wearing a latex glove on his right hand. Buckenjohn also spoke to Niamien N'Guessan, another tenant, who lived in the basement apartment of Buckenjohn's house, apprising him of the situation and requesting that he watch the defendant, whom she pointed out standing near some trees nearby. N'Guessan then watched the defendant from a window in his apartment and observed him pacing around the area where Buckenjohn had pointed.[6]

Meanwhile, a team of police officers from a narcotics enforcement unit of the New Haven police department was driving through the Hill section of New Haven on its way back to the police station in an unmarked police van with tinted windows. Detective Martin D'Addio drove the van, Lieutenant Bryan Norwood, the unit's head, sat in the front passenger seat, and approximately ten to twelve additional officers, including Officer Robert Fumiatti, were seated in the rear of the van. Although the officers were dressed in plainclothes, they wore blue mesh vests with the words "Police" and "Narcotics" emblazoned in yellow lettering on the front and back and had their police badges hanging on chains around their necks, over the vests.

While driving on Washington Avenue, D'Addio observed two black males—Hughes, wearing a white T-shirt, and the defendant, wearing a green camouflage jacket and pants—standing near a tree and a white car. After observing what he interpreted as furtive movements by the two men, Norwood decided that the officers should stop and conduct a field interview and instructed D'Addio to pull over.

D'Addio stopped the van, Norwood exited from the front passenger door, and several other officers, includ-

---

[6] Buckenjohn, Bass and N'Guessan separately identified the defendant, from a police photographic array, as the person they had seen on the evening of June 13, 2002.

ing Fumiatti, exited from the right side door of the van. Norwood exited the van in sync with Fumiatti, focused on interviewing the defendant. The officers took approximately two steps toward the defendant when he raised his right hand in the direction of the officers. Norwood then saw a "muzzle flash" and heard a shot ring out from the direction of the defendant's arm. The flash created a halo of light around the defendant's face, and Norwood, who had been maintaining visual contact with the defendant since observing him from the van, saw his face from approximately twenty feet away. Norwood and Fumiatti fell to the ground, and the defendant fled the scene. Fumiatti had received a single, nonfatal gunshot wound to his head.

During this encounter, N'Guessan had been watching the defendant and Hughes from the window of his basement apartment, and observed the van pulling up near the white car. N'Guessan saw several people exit the van and the defendant pull his right hand from his pocket and raise it, and then heard a bang and saw a flash emanate from the vicinity of the defendant's right hand. He then observed the defendant flee the scene.

D'Addio, who was watching through the opened side doors of the van after the other police officers had exited, also observed the defendant raise his hand in the direction of the officers, and then heard a shot and saw a muzzle flash. D'Addio then watched the defendant flee. D'Addio exited the van and saw Fumiatti on the ground, bleeding from the head.

Hughes realized that the persons exiting the van were police officers, and raised both of his hands. Hughes then heard a sound like a firecracker come from close behind him. Police officers handcuffed and patted down Hughes, but found no weapons on his person.

Police later found the defendant lying under some bushes a few blocks away from the scene of the shoot-

ing. Norwood was driven to this location and identified the defendant as the person who had shot Fumiatti.

In a grassy area near the scene of the shooting, police found a .38 caliber Colt revolver with three live rounds and one spent shell casing in its cylinder. A latex glove was attached to the gun. The state was unable to recover any identifiable prints on the gun, and the defendant's DNA was not on the gun. The defendant could not be eliminated, however, as a donor of DNA found on the glove that was attached to the gun, and one in every 8700 African-Americans was a potential donor. Additionally, within a two block radius of the scene of the shooting, police found a camouflage jacket, which the defendant later admitted was his, a set of keys belonging to the defendant's mother, which the defendant later claimed to have dropped as he had fled, and two latex gloves of a different texture than the one found attached to the gun. Each of the two gloves bore the defendant's palm prints. No gunpowder residue, however, was present on either glove. The defendant's T-shirt and jacket contained traces of lead and one component of gunpowder residue, but did not contain traces of other components of gunpowder residue.

At trial, Rameek Gordon, the defendant's cousin, testified for the state under a cooperation agreement relating to drug charges unconnected to the present case. Gordon testified that, at the defendant's request, he had procured a gun for the defendant, and he identified the gun found at the scene as that gun. Gordon later admitted, however, that he could not be 100 percent certain that the gun used to shoot Fumiatti was the one he had given to the defendant. Gordon also testified that the defendant was a drug dealer, and the state contended that the defendant's drug business was the motive for the shooting.

The defendant testified in his own defense, offering the theory that Gordon was selling drugs at the scene

and that Gordon may have been the shooter, although the defendant stated that he had not seen who actually shot Fumiatti. Specifically, the defendant testified to the following version of events. At the time of the shooting, the defendant was employed by Fleet Pride, a trucking parts company where the employees commonly wore latex gloves while working. On June 13, 2002, after returning home from work and taking a nap, he went to purchase a soda from a nearby store and encountered Gordon on the way. The defendant asked Gordon if he could purchase a bag of marijuana from him, and Gordon led him along a driveway between two cars where Gordon then squatted and removed from his rectum a bag containing various types of drugs. Gordon was wearing a latex glove, and the defendant, who was carrying latex gloves from his job, put on a pair to avoid touching any feces. Buckenjohn and another man approached the defendant, but he did not pay attention to what they said to him and just walked away. Gordon walked in a different direction, and the defendant did not see where he went, but noticed that Hughes had pulled up in the white car and went over to speak to him. Soon thereafter, a burgundy van pulled up very slowly, making the defendant suspicious, and he gestured with his hands at Hughes as if to ask what was going on, pointing to the people who had emerged from the van. The defendant was unsure of what was happening or who the people were emerging from the van.[7] The defendant then fled the scene out of fear, also concerned because he just had purchased marijuana in violation of the terms of his recent probation.[8] As he fled, the defendant heard gunshots, although he could

---

[7] The defendant testified that a friend of his had been killed previously in a drive-by shooting under similar circumstances approximately two blocks away.

[8] At the time of the shooting, the defendant recently had been released from prison on probation after having served thirteen years of a sentence from a previous conviction of robbery in the first degree.

not be certain how many. He kept running out of fear that these unknown persons were chasing him. The defendant eventually hid in the bushes where the police found and arrested him.

Thereafter, the jury returned a verdict of guilty on one count each of assault in the first degree, carrying a pistol without a permit and criminal possession of a pistol or revolver.[9] After further proceedings, the jury returned a verdict of guilty on part B of the information alleging the two sentence enhancement provisions: (1) commission of a class A, B or C felony with a firearm; and (2) due to a prior conviction for robbery in the first degree, being a persistent dangerous felony offender. In a separate proceeding, the trial court then found that it would best serve the public interest to impose extended incarceration under the persistent offender enhancement statute, and thereafter sentenced the defendant to a total effective sentence of forty-five years imprisonment.[10] The defendant appealed from the judgment of conviction to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The defendant raises two claims on appeal. First, he claims that the prosecutor committed various improprieties that deprived him of a fair trial. Second, he claims that the trial court's failure to have the jury, rather than the court, make the finding that enhancing the defendant's sentence as a persistent dangerous felony offender best served the public interest, a finding required under § 53a-40 (h) before the enhanced sen-

---

[9] The jury returned a not guilty verdict on a second count of first degree assault.

[10] The trial court imposed a forty year term of imprisonment for the conviction of first degree assault and the defendant's status as a persistent dangerous felony offender, a five year concurrent term of imprisonment for the conviction of carrying a pistol without a permit, a five year concurrent term of imprisonment for the conviction of criminal possession of a pistol or revolver and a five year consecutive term of imprisonment as a sentence enhancement for committing the first degree assault with a firearm.

tence could be imposed, violated the precepts of *Apprendi* v. *New Jersey*, supra, 530 U.S. 466, and its progeny. We conclude that the defendant was not deprived of a fair trial. We also conclude, however, that the case must be remanded to the trial court for a new sentencing proceeding.

I

We begin with the defendant's claims of prosecutorial impropriety. The defendant contends that the state engaged in three types of improper conduct in the course of its case-in-chief, its cross-examination of the defendant, and its rebuttal closing argument. First, the defendant claims the state improperly "referred to his silence while being interrogated," in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), when it referenced omissions in the defendant's testimony from a prior federal trial arising from the same incident at issue in the present case.[11] Second, the defendant claims that the state made improper "golden rule" arguments in its rebuttal closing statement when it asked the jurors to put themselves in the defendant's position and in the position of one of the state's witnesses. Third, the defendant claims that the state violated this court's holding in *State* v. *Singh*, 259 Conn. 693, 712, 793 A.2d 226 (2002), when it read to the jury portions of the redacted federal court transcript from that proceeding in which the defendant had been asked to comment on the veracity of the testimony of certain government witnesses. The defendant claims that these improprieties individually and collectively deprived him of his fifth amendment due process right to a fair trial[12] and, therefore, that this court should overturn his conviction and order a new trial.

---

[11] The defendant had been tried in federal court for being a felon in possession of a firearm.

[12] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."

The state contends that the prosecutor's conduct was not improper and that, even if we determine that there were instances of prosecutorial impropriety, any resulting prejudice did not rise to the level of a due process violation because of the abundance of evidence of the defendant's guilt. We agree with the state.

In analyzing claims of prosecutorial impropriety, we engage in a two step process. *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007). First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. Id. "To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 367, 924 A.2d 99 (2007).

## A

We begin with the defendant's claim that the state violated the rule established by the United States Supreme Court in *Doyle* v. *Ohio*, supra, 426 U.S. 617–18, prohibiting the state from eliciting at trial evidence of a defendant's silence following the receipt of *Miranda* warnings regarding his right to remain silent. Specifically, the defendant contends that the state committed a *Doyle* violation when it elicited evidence that he had failed to offer certain pertinent information during the police interrogation conducted immediately after the

shooting in order to impeach testimony he later provided as to those facts during his state and federal trials. The state contends that there was no such violation, and that the defendant's claim is based on a flawed reading of *Doyle*. We agree with the state.

The record reveals the following additional undisputed facts. The defendant received *Miranda* warnings before the police interrogation. He nonetheless proceeded with the interview. Thereafter, at his federal trial, the defendant offered for the first time the theory that his cousin, Gordon, likely was the shooter. At his state trial, the state introduced into evidence portions of the transcript from the defendant's federal trial[13] in which the federal prosecutor repeatedly had questioned the defendant about his failure, in the course of the police interrogation, to mention several facts to which he had testified for the first time in his federal trial, including: that he had been wearing a camouflage jacket and latex gloves on the night of the shooting; that Gordon had been present at the scene of the shooting; and that the defendant had been crouching in a nearby driveway immediately prior to the shooting.[14] The state

[13] Following a sidebar outside the presence of the jury in which the court heard arguments on admissibility, portions of the redacted federal court transcript were read to the jury and admitted into evidence as a full exhibit.

[14] The defendant cites a number of specific instances of testimony that he claims the state improperly introduced. We have reviewed all of the transcript portions cited by the defendant, and we conclude that none of these instances constituted prosecutorial impropriety. Therefore, due to the repetitive nature of the questioning involved in this claim, and in the interest of efficiency, we note only the following representative examples:

"[United States Attorney]: Did you tell the police that you were wearing a camouflage jacket?

"[The Defendant]: No, I didn't.

"[United States Attorney]: You withheld that information, right?

"[The Defendant]: Well, yeah. . . .

"[United States Attorney]: Did you tell the police that you were wearing latex gloves that night?

"[The Defendant]: That was never asked.

"[United States Attorney]: Did you tell them, sir, that you were wearing latex gloves?

"[The Defendant]: That was never asked.

also introduced portions of the transcript wherein the defendant was questioned as to why, at the close of the interrogation, when asked if he had any additional

---

"[United States Attorney]: You withheld that information from them, didn't you?

"[The Defendant]: They never asked about the gloves.

"[United States Attorney]: Because you knew, didn't you . . . that if you told police officers that you, in fact, had the camouflage jacket on and latex gloves, that that was going to be highly incriminating, correct?

"[The Defendant]: No.

\* \* \*

"[United States Attorney]: Now, you told the jury yesterday that you did talk to the police when you were back at the New Haven police department, correct?

"[The Defendant]: Correct.

"[United States Attorney]: And they had fully advised you of your rights, correct?

"[The Defendant]: Correct.

"[United States Attorney]: Did you ever, ever say a single word to the New Haven police department, either to the officers that were interviewing you or to any officer thereafter that you had seen [Gordon] out there?

"[The Defendant]: No, I did not.

"[United States Attorney]: And so when you were asked if you could provide anymore information, you said, 'No, there's no more information,' that was a lie?

"[The Defendant]: No, more or less, I was protecting my cousin.

"[United States Attorney]: You were protecting your cousin?

"[The Defendant]: Yes, I was.

"[United States Attorney]: Isn't it, in fact, true, sir, that you never said anything to any law enforcement authority about [Gordon] having been out there; that's true, isn't it?

"[The Defendant]: That's true.

\* \* \*

"[United States Attorney]: The police didn't know you had been in the driveway that night ducking down between the cars and so forth, correct?

"[The Defendant]: I can't answer that question, I don't know."

We note that, at trial, the defendant objected to the admission of only one of the colloquies he now claims as improper. Specifically, the defendant objected to the following portion of the transcript, but the trial court overruled the objection and admitted the testimony.

"[United States Attorney]: And I believe you testified yesterday or admitted yesterday that you lied to the New Haven police department shortly after this incident because you never told them that you had latex gloves on, correct?

"[The Defendant]: Because it was never asked.

"[United States Attorney]: You never told them that you had latex gloves on, did you?

"[The Defendant]: The question was never asked."

information to provide, the defendant not only had declined to provide this information, but also had claimed that he could provide no further information. Additionally, during cross-examination in the state trial proceedings, the state asked the defendant about his failure, during the interrogation, to mention: Gordon's presence at the scene; certain details of his drug transaction with Gordon; that the defendant had been chased immediately after the shooting;[15] and that he had neglected to provide these facts when asked for any additional information by the police.[16] Finally, in its

---

[15] The defendant also claims that the prosecutor improperly asked him why he had neglected to mention, in a taped telephone call that the defendant made to his family from jail while awaiting trial, that he had been chased.

[16] Specifically, the defendant claims the following questioning on cross-examination was improper:

"[State's Attorney]: And as far as this [Gordon] business, you never even mentioned that to the police, did you?

"[The Defendant]: No, I didn't.

"[State's Attorney]: And the police, at the end of the statement, asked you whether or not you wanted to say anything else that night, didn't they? They asked you that?

"[The Defendant]: Yeah, they did.

"[State's Attorney]: And you never mentioned [Gordon], did you?

"[The Defendant]: I never mentioned Greg's last name either. . . .

"[State's Attorney]: You lied to the police when you didn't tell them [Gordon] was out there, didn't you, sir?

"[The Defendant]: Yes, sir.

* * *

"[State's Attorney]: But you never said a word about some armed maniac chasing you down the street, did you?

"[The Defendant]: No, I didn't, sir.

"[Defense Counsel]: Objection. He never testified about any armed maniac chasing him.

"[State's Attorney]: I'll withdraw it. . . . Did you ever tell them anything at all about being chased from the scene of a shooting, sir?

"[The Defendant]: In the tape, sir, I was laughing, sir, I was playing with her. . . .

"[State's Attorney]: Well, the simple question . . . is in that conversation that you had with either [your girlfriend], your mother, or your grandmother you never once mentioned that anybody was chasing you, did you?

"[The Defendant]: Right, sir.

"[State's Attorney]: You never did?

"[The Defendant]: I don't think so, sir.

* * *

"[State's Attorney]: . . . Don't you think it was important if you knew who those people were, that didn't you think it was important to tell who they were so the police could investigate the shooting, sir?

rebuttal closing argument, the state listed "serious omissions" in the defendant's statement to the police, including his failure to mention that he had been wearing a camouflage jacket and latex gloves and that Gordon had been present at the scene of the shooting.[17] With these facts in mind, we turn to the defendant's claim that, by using as impeachment evidence his failure to make certain statements during his interrogation, the state violated the *Doyle* prohibition of utilizing post-*Miranda* silence against a criminal defendant.

"In *Doyle* [v. *Ohio,* supra, 426 U.S. 610] . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings

---

"[The Defendant]: At that moment, nah.

\* \* \*

"[State's Attorney]: Okay. Well, do you remember being asked the question at the end of the [police interrogation] statement: 'Mr. Bell, is there anything else you can add to this statement that can aid these investigators in this investigation at this time?' And you said: 'Huh?' 'Is there anything else you can add to this statement?' When they asked you about it they basically said to you, anything else you want to tell us, and you said no.

"[The Defendant]: Right.

"[State's Attorney]: Isn't that true?

"[The Defendant]: That's true.

"[State's Attorney]: So you knew that you claimed—you knew—you claim your cousin was out there and you lied to the police about it; isn't that true?

"[The Defendant]: I never said I lied about that, nah. I just didn't tell them about him. The question was never asked about him. . . .

"[State's Attorney]: And your answer was: 'I don't know what was in back of me.' Right?

"[The Defendant]: Right.

"[State's Attorney]: You never told the police that [Gordon] was out there, did you?

"[The Defendant]: No, I didn't. But in so many words I was letting them know that there was somebody else out there—

"[State's Attorney]: Isn't it—

"[The Defendant]: —I just didn't want to say his—

\* \* \*

"[State's Attorney]: —this testimony that you gave here today in rather graphic detail about where [Gordon] got that—those drugs from, can you tell the jury when was the first time you had ever mentioned that, sir?

"[The Defendant]: Federal court, to my knowledge."

[17] The defendant specifically claims that the prosecutor's statement that, "[the defendant] was asked by the New Haven police who was out there, [and] he never mentioned [Gordon], not once" constituted impropriety.

violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Internal quotation marks omitted.) *State* v. *Cabral*, 275 Conn. 514, 523, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005).

"*Doyle* applies whenever *Miranda* warnings have been given regardless of an arrest or custody." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 713, 759 A.2d 995 (2000). There are limits, however, to the protection afforded to an accused by *Doyle* and its progeny. *Doyle* does not apply to cross-examination regarding prior inconsistent statements. *Anderson* v. *Charles*, 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980) ("Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.").

In *State* v. *Alston*, 272 Conn. 432, 443–44, 862 A.2d 817 (2005), this court analogized the reasoning in *Anderson* to a case with facts similar to those in the present case. The defendant in *Alston*, after waiving his *Miranda* rights, had given a statement regarding a shooting, indicating that he did not know who had perpetrated the crime and had not been in the vicinity of the shooting on the night in question. Id., 436. At

trial, the defendant testified that most of his original statement was false and then for the first time implicated a third party in the shooting, whom he had not mentioned in his original interrogation. Id., 436, 438. On cross-examination, in a similar line of questioning to that employed by the state in the present case, the state's attorney pressed the defendant about his failure to inculpate the third party in prior police interviews. Id., 441–46. On appeal, the defendant claimed that the references to his failure to mention the third party, either during his initial interrogation or after he had terminated the interrogation but before trial, constituted a *Doyle* violation. Id., 442. This court disagreed, concluding that "the challenged references [fell] within the exception to *Doyle* articulated in [*Anderson* v. *Charles*, supra, 447 U.S. 408]." *State* v. *Alston*, supra, 443. The court reasoned that the challenged line of questioning did not attempt to attach meaning to silence improperly, but rather "refer[red] to a prior inconsistent statement voluntarily made by the defendant to the police." Id., 444. Quoting *United States* v. *Donnat*, 311 F.3d 99, 104–105 (1st Cir. 2002), we explained: "Where [a] defendant elects to speak to the police and gives statements that he later contradicts at trial, a prosecutor's inquiry into the defendant's failure to give the exculpatory account before trial does not draw a negative inference from the defendant's decision to remain silent but rather from his prior inconsistent statement." (Internal quotation marks omitted.) *State* v. *Alston*, supra, 444.

Indeed, the jurisprudence developed by this court in the wake of *Doyle* plainly precludes vindication of the defendant's claims in the present case. In *State* v. *Talton*, 197 Conn. 280, 292–93, 497 A.2d 35 (1985), the defendant challenged the admission of evidence that the defendant had refused to answer a question during police interrogation under the theory that his refusal to

answer constituted an invocation of his right to remain silent and, therefore, could not be used against him. This court rejected the defendant's argument, reasoning: "The *Doyle* decision . . . is not applicable to the facts of this case. The crucial distinction is that, here, the defendant did not remain silent after he was arrested and advised of his rights. After being given *Miranda* warnings, the defendant clearly chose to [forgo] his right to remain silent. Once an arrestee has waived his right to remain silent, the *Doyle* rationale is not operative because the arrestee has not remained silent and an explanatory statement assuredly is no longer insolubly ambiguous. By speaking, the defendant has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of his story. While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain selectively silent." (Internal quotation marks omitted.) Id., 295.

This court also has rejected claims based on selective omissions in circumstances markedly similar to those in the present case. In *State* v. *Casey*, 201 Conn. 174, 185, 513 A.2d 1183 (1986), after the defendant testified at trial to an incident that he previously had not mentioned, the state, in its closing argument, commented on the fact that the defendant had failed to supply this information to the police. Drawing on the reasoning in *Anderson*, the court held that "[t]he fact that the defendant failed to mention the [incident] during police questioning but testified to that incident during his trial is the equivalent of having given inconsistent statements

for the purposes of this rule."[18] Id. Relying in part on the language in *Talton* precluding selective invocation subsequent to a defendant's voluntarily given statement, we concluded that the state's comments were not improper. Id., 185–86.

Subsequently, commenting on *Casey*, we noted that, when a defendant voluntarily waives his right to silence and gives a statement to the police, "it is permissible to cross-examine [the] defendant about details that he or she may have omitted from responses to police questioning because the defendant, having agreed to speak with police about the subject matter of the crime, cannot later complain that he had failed to mention those details in the exercise of his fifth amendment right to remain silent. See, e.g., *State* v. *Casey*, supra, [201 Conn.] 186." *State* v. *Montgomery*, supra, 254 Conn. 716–17 n.30. We reaffirm that statement today. The defendant in the present case never asserted his right to remain silent; rather he opted to speak with the police at some length after he was apprehended. He cannot claim now that the omission in his statement to police

---

[18] This court previously rejected a claim that a trial court improperly had determined that a witness' testimony at trial—that he could not recall certain facts from a prior statement—was inconsistent with his prior statement. *State* v. *Whelan*, 200 Conn. 743, 748–49 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). This court noted: "Whether there are inconsistencies between the two statements is properly a matter for the trial court. . . . Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . and the same principle governs the case of the forgetful witness. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection. . . . The trial court has considerable discretion to determine whether evasive answers are inconsistent with prior statements." (Citations omitted; internal quotation marks omitted.) Id.

of details he later raised for the first time at trial, which omission the state thereafter used to impeach him, constituted an invocation of his right to remain silent as to those specific details. There is no *Doyle* violation in the present case.

## B

We turn next to the defendant's claim that the state made improper "golden rule" arguments in its rebuttal closing statement when it asked the jurors to put themselves in the defendant's position and in the position of one of the state's witnesses. The state claims that the contested statements were not improper golden rule arguments, because the prosecutor merely was urging the jury to assess the reasonableness of certain conduct reflected in the evidence. We agree with the state.

The following additional facts are relevant to our analysis of this claim. At trial, the state sought to discredit the defendant by highlighting, inter alia, the fact that in his initial interrogation he had lied to the police and told them that he did not know Hughes' last name, which he later admitted was false. The state revisited this deceit in its rebuttal closing, remarking as follows, with respect to the defendant's actions on the night of the shooting: "Ask yourselves if you were out on that corner that night and you had just witnessed a brutal, violent, senseless act like that and you ran from the scene and you knew that you didn't do it, you knew that you were innocent, and you knew that there was this good friend of yours who had gotten you a job, why wouldn't you tell the police his name? I mean, you're under arrest, you're looking [at] serious charges. A police officer has been seriously shot, you don't know if he's going to live or die, you could be looking at a murder charge. But what does [the defendant] do? Instead of telling the police, hey, you know, go talk '

with [Hughes], he was right there, he knows I didn't do anything. Does he do that? No. What does he do? I don't know his last name. I don't know his last name. Is that the type of conduct an innocent man would involve himself in? Absolutely not."

The state also sought to discredit the defendant by reminding the jury of his failure to tell the police that Gordon had been present at the scene on the night of the shooting: "The other thing is ask yourselves this question again, ladies and gentlemen, if you were truly innocent—put yourself in [the defendant's] shoes, if you were truly innocent and you had a family member who was a cousin, somebody who had given you $250 when you got out of jail to help you get by, get some clothes and so forth, you knew that you were truly innocent, wouldn't—wouldn't you tell the police [Gordon] is out there? Of course you would. Are you going to take the rap for something you didn't do? Absolutely not."

Finally, the state attempted to restore Buckenjohn's credibility after she had provided conflicting statements regarding whether and when she had seen the defendant in her backyard on the night of the shooting. "You want to blame [Buckenjohn] for saying that she believed that someone was in her backyard? . . . She doesn't know. She doesn't remember. But you're supposed to hold that against the state because a lady with young children who's pregnant sees or has knowledge of the fact that a police officer has been mortally wounded out in the street and she's supposed to forget about the fact that someone might be in her backyard, she's supposed to forget about that. Put yourself in her place, what would you have done? You would have done exactly the same thing she did."[19]

---

[19] The defendant objects only to the last two sentences of this portion of the state's argument. We have included part of the state's argument immediately preceding the contested portion in order to provide context.

With this testimony in mind, we turn to the defendant's claim. Although this court has not addressed directly the propriety of so-called "golden rule" arguments,[20] and our appellate courts never have addressed such a claim in a criminal case, our Appellate Court addressed a golden rule claim at some length in a civil case, explaining: "A golden rule argument is one that urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes. . . . Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence. . . . They have also been equated to a request for sympathy." (Internal quotation marks omitted.) *Murray* v. *Taylor*, 65 Conn. App. 300, 321, 782 A.2d 702, cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001). Indeed, in other jurisdictions that have addressed this issue, claims of improper golden rule arguments typically arise in the civil context, most frequently when a plaintiff's attorney asks the jury to put itself in the position of the plaintiff when assessing damages.[21] These civil cases, however, do not dictate our analysis in the criminal context.

---

[20] In one civil case, this court perfunctorily addressed a golden rule claim, wherein the plaintiff had claimed that the defendant improperly had asked the jury "whether they would like to be sued or have their company sued under the circumstances therein." (Internal quotation marks omitted.) *Begley* v. *Kohl & Madden Printing Ink Co.*, 157 Conn. 445, 452, 254 A.2d 907 (1969). The court concluded that the trial court had not abused its discretion in determining that the golden rule argument "was an offhand remark made by defense counsel; that the argument was not stressed; and that there was nothing contained therein to arouse the sympathy of the jurors or inflame their passions." Id.

[21] Indeed, some courts have determined that golden rule arguments are improper *only* when utilized with respect to the jury's determination of a damages award. See, e.g., *Johnson* v. *Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir.) (concluding that golden rule arguments did not deprive defendant appellants of fair trial because trial court repeatedly had instructed jury "to decide the case in a rational manner based on the evidence presented and not on emotions, sympathy, prejudice, or bias," all but two golden rule arguments were related to liability, not damages, and therefore were not

Because our courts have not addressed the use of golden rule arguments in the criminal context, we look to the jurisprudence of our sister courts for guidance in the present case. The golden rule claims in criminal cases that our research has uncovered arose when the prosecutor asked the jury to put itself in the place of the victim, the victim's family, or a potential victim of the defendant. See, e.g., *United States* v. *Palma*, 473 F.3d 899, 902 (8th Cir. 2007) (in tax fraud case, "prosecutor's comments . . . were akin to a golden rule violation because they suggested the jurors were themselves direct victims of [the defendant's] crimes"); *Grossman* v. *McDonough*, 466 F.3d 1325, 1348 (11th Cir. 2006) ("golden rule argument asks the jurors to place themselves in the victim's position, [or] asks the jurors to imagine the victim's pain and terror or imagine how they would feel if the victim were a relative" [internal quotation marks omitted]); *Hodge* v. *Hurley*, 426 F.3d 368, 384 (6th Cir. 2005) (prosecutor's suggestion that jurors put themselves in position of person who might be confronted by defendant at night impermissible golden rule argument). As in civil cases, this practice is "universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than

improper, and two arguments relating to damages "would not unduly affect the jury in light of the judge's charge"), cert. denied, 498 U.S. 920, 111 S. Ct. 297, 112 L. Ed. 2d 250 (1990); *Shultz* v. *Rice*, 809 F.2d 643, 651–52 (10th Cir. 1986) (golden rule arguments improper only when jury exhorted to put itself in party's shoes with respect to damages, not improper on issue of ultimate liability); *Burrage* v. *Harrell*, 537 F.2d 837, 839 (5th Cir. 1976) (golden rule argument not improper when related only to reasonableness of party's actions under exigent conditions and not directed to question of damages); but see *Edwards* v. *Philadelphia*, 860 F.2d 568, 574–75 (3d Cir. 1988) (rejecting distinction in propriety of golden rule arguments with respect to liability and damages because same concern of creation of undue sympathy and emotion applies to both matters, but concluding that use of such argument is rendered harmless either by immediate curative instruction or by comprehensive final instruction to jury regarding proper role in determining liability and damages).

on the evidence." (Internal quotation marks omitted.) *United States* v. *Palma,* supra, 902. The danger of these types of arguments lies in their "[tendency] to pressure the jury to decide the issue of guilt or innocence on considerations apart from the evidence of the defendant's culpability." (Internal quotation marks omitted.) *Bowling* v. *Parker,* 344 F.3d 487, 517 (6th Cir. 2003).

Of course, this court has recognized on numerous occasions that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Ancona,* 270 Conn. 568, 602, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). In the present case, however, the prosecutor was not appealing to the jurors' emotions or to their sympathies for the victim. Rather, he was asking the jurors to draw inferences from the evidence that had been presented at trial regarding the actions of the defendant and Buckenjohn, based on the jurors' judgment of how a reasonable person would act under the specified circumstances. Thus, when the state's attorney asked the jurors to put themselves in the defendant's shoes, if he were innocent, and to evaluate his actions, the state's attorney properly was asking them to infer the defendant's consciousness of guilt from his deceptive actions involving his interrogation. Similarly, the state's attorney attempted to have the jurors put themselves in Buckenjohn's place to determine whether her confusion as to the course of events on the evening of the shooting reasonably could be explained by her alarmed

state of mind caused by the circumstances in which she found herself and her children. We conclude, therefore, that these arguments did not appeal improperly to the jurors' emotions or exhort them to decide the case on anything other than the evidence presented to them.

C

Finally, we turn to the defendant's claim that the state violated this court's holding in *State* v. *Singh*, supra, 259 Conn. 712, when it introduced portions of the redacted transcript from the defendant's federal trial in which the defendant improperly had been asked to comment on the veracity of some of the state's witnesses. The state concedes that it was improper to introduce evidence that the defendant was asked if one of the state's witnesses was "wrong." It contends, however, that the rule in *Singh* was not contravened by the evidence admitted in which the defendant was asked to comment on the accuracy of other state's witnesses' testimony because the defendant already had provided testimony on direct examination that corroborated that testimony. The state claims that these questions merely were intended to "delineate the congruity between the defendant's testimony and the testimony of these other witness[es] . . . ." We disagree and conclude that this line of questioning was improper in its entirety.

The record reveals the following additional facts. At trial, the state's theory of the case was that the defendant was a drug dealer who had been selling drugs when police surprised him on the night of the shooting, and, therefore, his motive for shooting at the police was to escape being arrested on narcotics charges. The state, however, did not produce any physical evidence of drug dealing in its case.[22] Thus, the state relied on the

---

[22] When the defendant was searched immediately after the shooting, the police recovered only $24 from his pocket, and no drugs were found on his person. The police conducted two intensive grid searches in the two days following the shooting, and no drugs were recovered in the vicinity of the

testimony of its witnesses, primarily Anthony Banks, Gordon and Bass, to prove its theory that the defendant was a drug dealer. Banks testified that he had purchased drugs from the defendant on more than one occasion in the past, but gave inconsistent testimony as to when, where and how he had done so and that, although he had seen the defendant on the night of the shooting, he had not purchased any drugs from him. Banks was unable to explain how he had become involved in the case as a witness, but testified that he had been granted federal and state immunity in exchange for his testimony. Gordon testified that the defendant first had asked him about selling drugs when he, the defendant's grandmother and sister picked up the defendant from jail four months before the shooting, and that he had begun selling drugs for the defendant shortly thereafter. The defendant's grandmother and sister both testified, however, that the defendant and Gordon had not discussed any narcotics business during the trip.

Bass, who had confronted the defendant and Hughes outside of his apartment on the evening of the shooting because Buckenjohn thought they were trying to break into her car, testified that, when he had approached the two men and asked them to leave, the defendant explained that they were not trying to steal the car and were "trying to make some money." Bass stated that, when the defendant then shook his hand, he noticed that the defendant was wearing a latex glove. Bass also stated that he had seen the defendant around the neighborhood in the spring prior to the shooting.

Finally, the state introduced, without objection, the following portions of the redacted transcript of the defendant's cross-examination in his federal trial:

incident. On the day after the shooting, while the defendant was in custody, police executed a search of the defendant's residence, but did not recover any narcotics, drug paraphernalia, cash, guns or ammunition.

"[United States Attorney]: Okay. When [Gordon] said that he had picked you up at prison, that was true?

"[The Defendant]: That was true.

"[United States Attorney]: He said he gave you money?

"[The Defendant]: That was true.

\* \* \*

"[United States Attorney]: Okay. And in that connection, [Bass] had testified that you said, 'I'm just trying to make some money?'

"[The Defendant]: Never made that statement.

"[United States Attorney]: Never made that statement. So you would agree with me, however, that [Bass] was correct when he described the clothes you were wearing?

"[The Defendant]: Yes.

"[United States Attorney]: So, he's right about that?

"[The Defendant]: Yes.

"[United States Attorney]: No question?

"[The Defendant]: No question.

"[United States Attorney]: Would you agree with me, sir, that he was right when he testified to where you were in the driveway when he came outside; he was right about that?

"[The Defendant]: Could you repeat the question?

"[United States Attorney]: Sure. Was he correct when he testified as to where you were in the driveway when he came out?

"[The Defendant]: I don't remember he said anything about him seeing me in the driveway.

"[United States Attorney]: Well, when he discussed—

"[The Defendant]: He said I was on the sidewalk.

"[United States Attorney]: Was he accurate about that?

"[The Defendant]: Yes.

"[United States Attorney]: When he said he shook hands with you, was he accurate about that?

"[The Defendant]: Yes.

"[United States Attorney]: When he told this jury that when he shook hands with you, you had a cold, clammy hand, and he looked down and you had some kind of latex glove on. Was he accurate about that?

"[The Defendant]: Yes, he was.

"[United States Attorney]: But it's your testimony under oath that when he says that you said, 'I'm just trying to make some money,' then that's wrong?[23]

"[The Defendant]: I never said that. That's wrong. I never said that.

"[United States Attorney]: Because if you say or admit that you told him, 'I'm just trying to make some money,' then you're essentially admitting that you're out there dealing drugs, right?

"[The Defendant]: I don't need to be on the streets, sir.

"[United States Attorney]: So you can't say—you can't agree with that fact? You can't agree that you said to Bass, 'I'm just out here trying to make some money,' correct?

"[The Defendant]: I don't need the money, sir.

---

[23] The state concedes that this question violates "the rule that a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong." *State* v. *Singh*, supra, 259 Conn. 712.

* * *

"[United States Attorney]: . . . The testimony of a variety of people here that the police officer had taken a step or two, two or three steps, and a shot was fired. You heard that testimony, right?

"[The Defendant]: Yes.

"[United States Attorney]: Do you dispute that in any way?

"[The Defendant]: To my knowledge, as soon as the doors came crashing open, I took off running."

In *Singh*, this court adopted the "well established evidentiary rule [in other jurisdictions] that it is improper to ask a witness to comment on another witness' veracity." *State* v. *Singh*, supra, 259 Conn. 706. The primary reason for this prohibition, we explained, is that "determinations of credibility are for the jury, and not for witnesses." (Internal quotation marks omitted.) Id., 707. Indeed, this long-standing rule has deep roots in our jurisprudence. See *State* v. *Schleifer*, 102 Conn. 708, 724, 130 A. 184 (1925) ("[i]t is never permissible, though often done, to ask a witness to characterize the testimony or statement of another witness"); see also *Nimely* v. *New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("[t]he credibility of witnesses is exclusively for the determination by the jury, and *witnesses may not opine as to the credibility of the testimony of other witnesses* at the trial" [emphasis in original; internal quotation marks omitted]). Thus, "questions that ask a defendant to comment on another witness' veracity [are] improper because they] invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or inno-

cence." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 707–708.

A second justification for the rule in *Singh* is that questions asking a defendant to comment adversely on the credibility of another witness create a risk of confusing jurors by leading them to believe that in order to acquit the defendant they must find that the witness has lied. Id., 708. Of course, "[a] witness' testimony . . . can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . ." (Citation omitted; internal quotation marks omitted.) Id. In this vein, we stated specifically in *Singh* that "a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong." Id., 712.

In the present case, the questions in which the defendant was asked whether Bass was "wrong" in parts of his testimony and whether the defendant disputed the testimony of other witnesses clearly fall into this prohibited category.[24] The other claimed improprieties in the present case, however, involve a variation on the classic type of *Singh* violation in which a defendant is asked whether another witness is lying, instead asking the defendant whether a witness' testimony was "true," "right" or "accurate" and whether the defendant agreed

---

[24] These witnesses included police officers who had been present at the scene of the shooting. As we noted in *Singh*, the risk of leading jurors to conclude that in order to acquit a defendant they must find that the witness whose testimony is in question has lied is "especially acute when the witness is a government agent in a criminal case. *United States* v. *Fernandez*, 145 F.3d 59, 64 (1st Cir. 1998) (finding it unfair to force witness to choose between recanting own testimony and calling law enforcement officer a liar '[g]iven the faith the jury may place in the word of a law enforcement officer'); *United States* v. *Weiss*, 930 F.2d 185, 195 (2d Cir.), cert. denied, 502 U.S. 842, 112 S. Ct. 133, 116 L. Ed. 2d 100 (1991) (explaining that special concern may be warranted in such cases because some people may believe that government agent has 'heightened credibility') . . . ." (Citation omitted.) *State* v. *Singh*, supra, 259 Conn. 708.

with certain statements of other witnesses. Although these questions did not ask the defendant *overtly* to say whether a witness was wrong or mistaken, effectively, they essentially asked the same improper question, only phrased in the positive rather than in the negative.[25] See *United States* v. *Freitag*, 230 F.3d 1019, 1024 (7th Cir. 2000) (asking defendant if testimony of other witnesses is true is improper because it "invades the province of the jury; indeed asking if testimony is true implies that if it is not, it is a lie, which is a credibility question for the jury to decide"); see also *United States* v. *Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998) (reversible error when one government witness permitted to testify, over defense objection, that another government witness was telling truth, because determination of witness credibility is for jury and such testimony constituted bolstering by inadmissible evidence). Moreover, it is clear from the record that the prosecutor's intention in the present case was to force the defendant to characterize the state's witnesses as truthful in much of their testimony, and then to ask the defendant why those otherwise truthful witnesses would be deceitful in other areas of their testimony that the defendant had contradicted in his own testi-

---

[25] The state's contention that these questions were proper because the defendant previously had provided testimony fairly congruent with that of the witnesses on whose veracity the state then asked him to comment is unavailing. Initially, we note that it is improper for the state's attorney to ask a defendant to bolster the state's witnesses' testimony by affirming its veracity. Moreover, the state's attorney properly could have elicited this congruence by asking the defendant questions that would have educed answers corroborating those of the state's witnesses. Finally, although the state's attorney believed that the defendant would answer affirmatively to these questions, he could not have known to a certainty that the defendant would do so, thus creating the possibility that the defendant could have been forced to categorize the witnesses' statements as wrong or false despite the positive framing of the question. Nonetheless, the congruency between the defendant's responses and his other testimony is relevant to our harm analysis in part I D of this opinion.

mony. Thus, the defendant undeniably improperly was asked to judge the credibility of the state's witnesses.

Finally, we note that, in deciding *Singh*, this court declined to draw a distinction between the propriety of using the words " 'wrong' " or " 'mistaken' " as compared to " 'lying.' " *State* v. *Singh*, supra, 259 Conn. 706–707, citing *United States* v. *Gaind*, 31 F.3d 73, 77 (2d Cir. 1994). "Although questioning whether a witness' testimony is wrong may, at first blush, seem less egregious, we conclude that it is nonetheless improper because it requires the witness to characterize testimony and may lead to the same problematic results." *State* v. *Singh*, supra, 712 n.16. Likewise, in the present case, it is immaterial whether the state inquired whether a witness' testimony was correct or whether the witness was being truthful. In either case, it required the defendant to comment improperly on another witness' veracity, an ascertainment that is the sole province of the jury. Thus, the introduction of this line of questioning was improper.

D

Having concluded that the *Singh* violations were the sole impropriety committed at trial, we now must determine whether this impropriety was so harmful as to deprive the defendant of a fair trial. In order to do so, we apply the factors first set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). These factors include: "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 573, 849 A.2d 626 (2004).

Although a defendant's failure to object to improprieties does not preclude review of his claims; see id., 572–74; "[w]hen defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . . [T]he fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Citation omitted; internal quotation marks omitted.) *State* v. *Camacho*, supra, 282 Conn. 370.

Initially, therefore, we note that, although given the opportunity to contest the admission of any part of the redacted federal transcript,[26] the defendant did not object to the admission of the portions of the transcript that contained the *Singh* violations. Additionally, the record does not contain any indication that the defendant thereafter requested a curative instruction regarding these passages. Thus, we may infer that the defendant did not consider the admission of this evidence as seriously prejudicial to his trial.

Second, although the challenged questions by the prosecutor in the defendant's federal trial undoubtedly were improper and we do not condone the use of such questioning, because all except one of the improper questions involved answers in which the defendant acknowledged the truthfulness of the testimony of the state's witnesses as corroborative of his own, the defendant, for the most part, was not put in the perilous position of having to indicate that his testimony was

---

[26] Indeed, as we have noted, the defendant did object to the admission of one of the sections discussed in part I A of this opinion. See footnote 14 of this opinion.

in direct conflict with that of the state's witnesses. That is, there was a low risk that the jury might have believed erroneously that if the state's witnesses were being truthful, then the defendant must have been lying. Additionally, the improprieties at trial were confined to the admission of the federal transcript and were not revisited in the state's cross-examination or closing arguments.

Next, we note that the trial court gave comprehensive general instructions, including the following reminder to the jury: "The credibility, the believability, of the witnesses and the weight to be given to their testimony are matters entirely within your hands. It is for you alone to determine their credibility. . . . It is the quality, not the quantity, of the testimony which should be controlling. Nor is it necessarily so that because a witness testifies to a fact and no one contradicts it you are bound to accept that fact as true. The credibility of the witness and the truth of the fact [are] for you to determine." The court also instructed the jury to assess witness credibility not only in terms of appearance, demeanor and bias, but also in terms of the witness' ability to recall events and the testimony's harmony with the whole of the evidence presented. Although we have commented that "a general instruction does not have the same curative effect as a charge directed at a specific impropriety, particularly when the misconduct has been more than an isolated occurrence"; *State* v. *Ceballos*, 266 Conn. 364, 413, 832 A.2d 14 (2003); unless there is an indication to the contrary, we presume that the jury followed the court's instructions. See *State* v. *Warholic*, 278 Conn. 354, 401, 897 A.2d 569 (2006) ("[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions" [internal quotation marks omitted]). There is no such contrary indication in the present case. See *State* v. *Ritrovato*, 280 Conn. 36, 66–69, 905 A.2d

1079 (2006) (concluding general jury instructions sufficient to cure *Singh* violations committed once at trial and once in closing arguments when state's case was strong and defendant failed to object or request specific curative measures).

Finally, we note that the state's case against the defendant was strong and contained substantial evidence not affected by the prosecutorial improprieties. The defendant himself acknowledged his presence at the scene on the night of the shooting. He also admitted that he had been wearing camouflage clothing and latex gloves, and that he had fled the scene and was hiding when the police found him. Lieutenant Norwood and N'Guessan both testified that they had seen the defendant raise his arm in the direction of Officer Fumiatti and had seen a flash emanate from the defendant's hand immediately before Fumiatti fell to the ground. Hughes also testified that the gunshot came from the defendant's direction. Moreover, although the defendant questions whether the jury reasonably could have concluded that he was a drug dealer, the state adduced undisputed evidence that the defendant had purchased marijuana in conscious violation of his probation, an alternative possible motive supporting the state's theory that the defendant had shot at the officers to avoid being arrested.

On the basis of the previous discussion, we conclude that the prosecutorial impropriety in the present case did not so prejudice the defendant as to make his conviction a denial of due process. Therefore, we decline to reverse his conviction on the basis of these claims.

II

We next turn to the defendant's claim that the trial court's determination of whether to enhance his sentence as a persistent dangerous felony offender (persis-

tent offender)[27] under § 53a-40 (h) violated the precepts of *Apprendi* v. *New Jersey,* supra, 530 U.S. 466, and its progeny. Specifically, the defendant contends that, after the jury found beyond a reasonable doubt that he was a persistent offender pursuant to § 53a-40 (a) (1) (A), the jury, not the trial court, should have made the necessary finding under § 53a-40 (h) that the defendant's "history and character and the nature and circumstances of [his] criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest . . . ." Because the trial court made that determination, the defendant contends it determined a fact that exposed him to a greater penalty than that authorized by the facts found by the jury's verdict alone, in violation of *Apprendi.* The defendant acknowledges that, because he failed to raise this issue at the trial court, he can prevail only if he satisfies the requirements for unpreserved constitutional claims set forth in *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[28]

The state contends that the trial court's public interest determination did not violate *Apprendi* and its progeny because: (1) it is not the type of specific factual determination at issue in those cases; and (2) it was merely duplicative of facts subsumed within the jury's finding that the defendant is a persistent offender by

---

[27] As we note later in this opinion, there are several categories of persistent offenders under § 53a-40, based on the relative dangerousness and type of offenses at issue. We use the abbreviated term "persistent offender" in this part of the opinion for convenience and do not intend to refer to any type of persistent offender other than persistent dangerous felony offender.

[28] "Under *Golding,* 'a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.' *State* v. *Golding,* supra, 213 Conn. 239–40." *State* v. *Fauci,* supra, 282 Conn. 33 n.5.

virtue of his prior and current convictions. The state
further contends that, even if the court's failure to sub-
mit this determination to the jury was a constitutional
violation, it was harmless error given the defendant's
criminal history and the facts of the case. We conclude
that the determination by the trial court, rather than
the jury, that imposing extended incarceration would
best serve the public interest clearly violated the defen-
dant's constitutional rights as explicated in *Apprendi*
and its progeny. We further conclude that, because the
jury must make that determination before the enhanced
sentence under § 53a-40 (h) can be imposed, the case
must be remanded for a new sentencing proceeding.

Before turning to the issue at hand, we note that the
defendant's claim requires both that we construe § 53a-
40 and that we consider whether the statute so con-
strued violates *Apprendi*. Thus, we are guided by our
well settled rules of statutory construction; see *State*
v. *Peeler*, 271 Conn. 338, 434, 857 A.2d 808 (2004), cert.
denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110
(2005); and conduct plenary review over these signifi-
cant questions of law. *State* v. *Kirk R.*, 271 Conn. 499,
510, 857 A.2d 908 (2004); *State* v. *Peeler*, supra, 434.

The record reveals the following additional facts.
After the jury returned a verdict of guilty on part A of
the information of one count of assault in the first
degree, one count of carrying a pistol without a permit
and one count of criminal possession of a pistol or
revolver, the state presented its evidence on part B of
the information. In part B, the state charged, inter alia,
that the defendant is a persistent offender because he
had been convicted in the present case of assault in
the first degree and, prior to this conviction, had been
convicted of robbery in the first degree. The jury there-
after found, beyond a reasonable doubt, that the state
had proved the two convictions necessary to deem the

defendant a persistent offender, as that term is defined under § 53a-40 (a). See footnote 4 of this opinion.

In a subsequent proceeding, the trial court heard argument from the parties as to whether the defendant's sentence should be enhanced under § 53a-40 (h) based on his status as a persistent offender. In particular, the state cited evidence demonstrating that: the defendant had a long history of felony convictions dating back to the early 1980s; he previously had been given consideration by the department of correction and had reoffended during a furlough from prison; and his history showed a progression toward increasingly violent crimes. Before imposing sentence, the court noted that it had considered the office of probation's presentence report, as well as statements made by Fumiatti, his family, the defendant and his family. The court stated that the evidence amply supported the jury's verdict and that, but for the skills of the medical team attending to Fumiatti, he would have died from his gunshot wound. The court then stated to the defendant: "[F]or the past twenty-one years, since you were seventeen years old, there has not been one day when you have not either been in jail, on parole or on probation. And here's the thing, Mr. Bell, if by some miracle you were released today, I have no doubt that within twenty-four hours you'd be back selling drugs with [a] piece just like you were within twenty-four hours of the time you were released from your last incarceration from federal prison." Finally, the court stated: "Here's my sentence, in accordance with . . . [§] 53a-40, the court makes a finding that your criminal history and the character of your criminal conduct indicates that extensive incarceration is required to protect the public safety. So, therefore, the following sentence is imposed: On count one, on the charge of assault in the first degree as a persistent, dangerous felony offender, the court imposes the maximum sentence of [forty] years imprisonment

. . . ." Thus, as a result of the sentence enhancement, the trial court doubled the defendant's sentence from the maximum term of imprisonment otherwise prescribed for first degree assault, a class B felony, of twenty years. See General Statutes § 53a-35a.

In light of this background, we begin with a discussion of the evolving legal landscape under *Apprendi* v. *New Jersey*, supra, 530 U.S. 466, and its progeny regarding the relative roles of the trial court and the jury in sentence enhancements. In *Apprendi*, the United States Supreme Court considered whether it was consistent with the guarantees of due process under the fourteenth amendment and of a trial by jury under the sixth amendment for a trial court to enhance the defendant's sentence on the basis of its determination, by a preponderance of the evidence, that "the defendant in committing the crime acted with a purpose to intimidate an individual . . . because of race . . . ." (Internal quotation marks omitted.) Id., 468–69, quoting N.J. Stat. Ann. § 2C:44-3 (e) (West Sup. 1999–2000). Under the New Jersey scheme, the defendant's offense had carried a maximum term of imprisonment of ten years, but the hate crime statute permitted an extended term, in the defendant's case, of twenty years based on the court's finding under the statute. *Apprendi* v. *New Jersey*, supra, 468–69. The Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the [following rule] . . . '[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.' " Id., 490.

The *Apprendi* court noted "the constitutionally novel and elusive distinction between 'elements' and 'sentencing factors.' . . . Despite what appears to us the clear 'elemental' nature of the factor here, the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" (Citation omitted.) Id., 494. The court also noted, however, "that nothing in [the common-law history on which the court had relied] suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case." (Emphasis in original.) Id., 481.

Two years later, in *Ring* v. *Arizona*, 536 U.S. 584, 588, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Supreme Court considered whether it is a violation of the sixth amendment right to a jury trial in a capital prosecution when, "following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." Under Arizona's death penalty scheme, the defendant's crime of first degree murder was punishable by a term of life imprisonment or death. Id., 592. Other provisions in that scheme required that a judge conduct a separate hearing to determine the defendant's sentence based on enumerated aggravating and mitigating factors and authorized a sentence of death only when there was at least one aggravating factor and no mitigating factor weighed in favor of leniency. Id., 592–93. The trial court in *Ring* had found two statutory aggravating factors, one of which was "that the offense was committed 'in an espe-

cially heinous, cruel or depraved manner,' " but no mitigating factors that weighed in favor of leniency, and therefore sentenced the defendant to death. Id., 594–95. The Supreme Court held that, because the court's finding of the aggravating factors had exposed the defendant to a greater punishment than that authorized by the jury's verdict alone, this scheme contravened *Apprendi.* Id., 597–98, 609.

In so concluding, the Supreme Court overruled prior case law that had held that this type of scheme is constitutional because the jury verdict exposed the defendant to the possibility of being sentenced to death; id., 603; and that the aggravating factors under such a scheme merely were "sentencing considerations guiding the choice between life and death." (Internal quotation marks omitted.) Id., 598. It noted that it was bound by the Arizona Supreme Court's authoritative construction of that state's own scheme, under which "[the] [d]efendant's death sentence required the judge's factual findings." (Internal quotation marks omitted.) Id., 603. The United States Supreme Court then reasoned that, given this construction and *Apprendi*'s rejection of the relevance of the label of the determinative finding as a sentencing factor and its emphasis on the *effect* of the court's finding, the scheme violated the defendant's sixth amendment right to have a jury determine whether any aggravating factors existed. Id., 604–605.

Thereafter, in *Blakely* v. *Washington,* 542 U.S. 296, 299–300, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the Supreme Court considered Washington's sentencing reform act under which the facts admitted in the defendant's guilty plea, standing alone, had dictated a maximum sentence of fifty-three months, but under which the court had been authorized to impose an "exceptional" sentence of ninety months after making a judicial determination that the defendant had acted with " 'deliberate cruelty,' " a fact to which the defendant had

not pleaded. Washington state law generally provided indeterminate sentences by class of felony—in the defendant's case, a term not exceeding ten years. Id., 299. The state's sentencing reform act, however, further limited the range of sentence that the court could impose based on the specific offense—in the defendant's case, to a maximum of fifty-three months. Id. The court then was permitted to impose a sentence in excess of that term if it found "substantial and compelling reasons justifying an exceptional sentence. . . . The [sentencing reform act] list[ed] aggravating factors that [would] justify such a departure, which it recite[d] to be illustrative rather than exhaustive. . . . Nevertheless, [a] reason offered to justify an exceptional sentence [could] be considered only if it [took] into account factors other than those which [were] used in computing the standard range sentence for the offense." (Citations omitted; internal quotation marks omitted.) Id. The trial court in *Blakely* had relied on one of the enumerated grounds, deliberate cruelty, as the basis for the sentence enhancement. Id., 300. The United States Supreme Court concluded that this scheme violated the precepts of *Apprendi* because the trial court could not have enhanced the defendant's sentence on the basis of the facts admitted in the defendant's plea. Id., 305. "Our precedents make clear . . . that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" (Emphasis in original.) Id., 303.

Significantly, for purposes of the issue before this court in the present case, the Supreme Court rejected the state's efforts "to distinguish *Apprendi* and *Ring* [from the Washington scheme] by pointing out that the enumerated grounds for departure in its regime are illustrative rather than exhaustive. This distinction is immaterial. Whether the judge's authority to impose an

enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*), or any aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact." Id., 305. "Nor does it matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure. He cannot make that judgment without finding some facts to support it beyond the bare elements of the offense. Whether the judicially determined facts *require* a sentence enhancement or merely *allow* it, the verdict alone does not authorize the sentence."[29] (Emphasis in original.) Id., 305 n.8.

As foreshadowed by *Blakely*; see id., 305 n.9; challenges to the federal sentencing guidelines soon followed. In *United States* v. *Booker*, 543 U.S. 220, 226–27, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), the Supreme Court concluded, on the basis of *Blakely*, that application of the sentencing guidelines violated the *Apprendi* rule because the defendant's sentence had been increased based on additional facts that the sentencing judge found by a preponderance of the evidence.[30] In the

---

[29] The Washington legislature subsequently amended its scheme to comply with *Blakely* by: (1) having the jury determine from an exclusive list of factors whether an aggravating factor, other than a prior conviction, exists, which in turn exposed the defendant to the enhanced sentence; and (2) then conferring discretion on the trial court to determine whether that factor is a substantial and compelling reason to impose the higher sentence. See 2005 Wash. Laws, c. 68, Senate Bill No. 5477, § 1.

[30] The Supreme Court consolidated two cases from different Circuit Courts of Appeals in *Booker*. *United States* v. *Booker*, supra, 543 U.S. 226. One of the defendants in *Booker* had been convicted of possession with intent to distribute at least fifty grams of crack cocaine, after the jury heard evidence that he had 92.5 grams in his duffel bag. Id., 227. Federal law prescribed a maximum sentence of life for that offense. Id. Under the sentencing guidelines, however, based on the defendant's criminal history and the quantity of drugs found by the jury, the sentencing guidelines required the court to select a base sentence in the range of 210 months to 262 months. Id. The trial court then held a posttrial sentencing proceeding and concluded by a preponderance of the evidence, inter alia, that the defendant had possessed

majority opinion on the *Apprendi* violation, authored by Justice Stevens,[31] the court expressly rejected the notion that the scheme was constitutional simply because courts historically had been vested with authority to increase sentences based on "any unusual blameworthiness in the manner employed in committing a crime," and the fact that this "authority . . . [was] require[d] to be exercised consistently throughout the [guidelines] system." Id., 235–36. In a separate majority opinion on the remedy, authored by Justice Breyer, the court determined that excising those portions of the guidelines that made their application mandatory would cure the sixth amendment violation because the sentencing court then would have discretion to consider the factors therein, but the maximum sentence would have been determined by a range authorized by the jury's verdict.[32] Id., 245.

---

an additional 566 grams of crack cocaine. Id. Under the guidelines, that finding mandated that the court impose a sentence between 360 months and life imprisonment. Id. As a result, instead of the sentence of twenty-one years and ten months that the court could have imposed on the basis of the facts proved to the jury beyond a reasonable doubt, it imposed a thirty year sentence. Id.

[31] There are two majority opinions in *Booker*, one on the *Apprendi* violation and one on the remedy, with four different justices aligned on each of the two majority opinions and Justice Ginsberg providing the fifth, deciding vote in each opinion. Interestingly, the four other members of the majority opinion on the remedy were the four dissenting justices in *Apprendi*. See *Apprendi* v. *New Jersey*, supra, 530 U.S. 523 (O'Connor, J., joined by Rehnquist, C. J., and Kennedy and Breyer, Js., dissenting).

[32] The majority opinion on the *Apprendi* violation in *Booker* had noted: "[E]veryone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [guidelines] the provisions that make the [g]uidelines binding on district judges . . . . For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." *United States* v. *Booker*, supra, 543 U.S. 233. As a practical matter, the effect of the court's remedy was that the higher indeterminate sentence range imposed by law for the specific offense for which a defendant had been convicted was the controlling maximum sentence for *Apprendi* purposes, which in the named defendant's case was life imprisonment. See footnote 30 of this opinion. The sentencing court then would have discretion to apply all relevant factors

Finally, in *Cunningham* v. *California*, 549 U.S. 270, 275–76, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), the Supreme Court held unconstitutional California's determinate sentencing law, which had assigned authority to the trial court to find facts, by a preponderance of the evidence, that enhanced the defendant's sentence from the presumptive "middle" term of twelve years to the "upper" term of sixteen years. The sentencing scheme obliged the trial court to impose the middle term unless it found aggravating or mitigating factors by a preponderance of the evidence to justify the prescribed "lower" or "upper" term. Id., 277. The nonexhaustive list of aggravating circumstances included enumerated "[f]acts relating to the crime," enumerated "[f]acts relating to the defendant," and "[a]ny other facts statutorily declared to be circumstances in aggravation . . . ." (Citation omitted; internal quotation marks omitted.) Id., 278, quoting California Rules of Court 4.421; see footnote 37 of this opinion. Beyond these enumerated circumstances, "the judge [was] free to consider any additional criteria reasonably related to the decision being made." (Internal quotation marks omitted.) *Cunningham* v. *California*, supra, 278–79.

The Supreme Court rejected the view that, in "operation and effect," the statutes "simply authorize[d] a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range" and therefore, "the upper term is the statutory maximum . . . ." (Internal quotation marks

under the guidelines, both those that could decrease the sentence to a "base" sentence and those that then could increase the sentence from that lower base sentence. The majority opinion addressing the remedy recognized that it could cure the constitutional defect in the manner suggested by the remedy dissenters, retaining the guidelines in their entirety and requiring a jury trial on any facts that would increase the base sentence, but reasoned that discretionary application of guidelines was more faithful to Congress' intent. *United States* v. *Booker*, supra, 246–49.

omitted.) Id., 289. The court noted: "We cautioned in
*Blakely* . . . that broad discretion to decide what facts
may support an enhanced sentence, or to determine
whether an enhanced sentence is warranted in any par-
ticular case, does not shield a sentencing system from
the force of our decisions. If the jury's verdict alone
does not authorize the sentence, if, instead, the judge
must find an additional fact to impose the longer term,
the [s]ixth [a]mendment requirement is not satisfied."[33]
Id., 290.

In light of this legal landscape, we turn to our persis-
tent offender statute to determine whether the trial
court's application of it in the present case violated the
*Apprendi* rule. Subsection (a) of § 53a-40 provides in
relevant part: "A persistent dangerous felony offender is
a person who: (1) (A) Stands convicted of manslaughter,
arson, kidnapping, robbery in the first or second degree,
or assault in the first degree, and (B) has been, prior
to the commission of the present crime, convicted of
and imprisoned under a sentence to a term of imprison-
ment of more than one year or of death, in this state
or in any other state or in a federal correctional institu-
tion, for any of the following crimes: (i) The crimes
enumerated in subparagraph (A) of this subdivision or
an attempt to commit any of said crimes . . . ." The
defendant does not challenge his status as a persistent
offender in light of the jury's verdict in the present case

---

[33] As a remedy to this constitutionally defective scheme, the Supreme
Court suggested that California could either vest the jury with fact-finding
authority for the enhanced sentence or permit judges to exercise their
discretion within a prescribed statutory range authorized by the jury's ver-
dict. *Cunningham* v. *California,* supra, 549 U.S. 293–94. In response to
*Cunningham,* the California legislature vested discretion entirely with the
trial court to determine which of the three lower, middle and upper definite
sentences to impose, and to consider the same evidence and aggravating
or mitigating factors under its prior scheme. See Cal. Penal Code § 1140
(Deering 1993), as amended by c. 3 of 2007–2008 Legislative Session, Senate
Bill No. 40, §§ 1 and 2.

of guilty on the count of assault in the first degree and his previous conviction of robbery in the first degree.

Subsection (h) of § 53a-40 provides in relevant part: "When any person has been found to be a persistent dangerous felony offender, *and the court is of the opinion that such person's history and character and the nature and circumstances of such person's criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest,* the court, in lieu of imposing the sentence of imprisonment authorized by section 53a-35a . . . shall sentence such person to a term of imprisonment of not more than forty years . . . ." (Emphasis added.) The dispositive question under *Apprendi* is: "[D]oes the [statute prescribe a] required finding [that] expose[d] the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi* v. *New Jersey,* supra, 530 U.S. 494.

In examining the text of the statute, we note at the outset that, by its use of the conjunctive "and," the statute appears to impose two preconditions for an enhanced sentence to be imposed in lieu of the lesser sentence prescribed for the offense for which the defendant stands convicted: (1) the jury's determination that the defendant is a persistent offender; and (2) the court's determination that the defendant's history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration will best serve the public interest. See *Penn* v. *Irizarry,* 220 Conn. 682, 687, 600 A.2d 1024 (1991) ("[t]he use of the conjunctive, 'and,' indicates that both conditions must be fulfilled before a new primary [election] may be ordered [pursuant to General Statutes § 9-329a]"); *Nicotra Wieler Investment Management, Inc.* v. *Grower,* 207 Conn. 441, 455, 541 A.2d 1226 (1988) ("we find significance in the use of the word 'and' between the two stated conditions"). Had the legislature intended

for the jury's persistent felony offender finding alone to subject the defendant to the enhanced sentence and simply to vest the trial court with discretion not to apply the enhanced sentence, the legislature readily could have made such an intent clear. For example, the legislature could have made minimal changes to the current language to express such an intent by providing: When any person has been found to be a persistent dangerous felony offender, *unless* the court is of the opinion that such person's history and character and the nature and circumstances of such person's criminal conduct indicate that extended incarceration and life-time supervision will *not* best serve the public interest, the court, in lieu of imposing the sentence of imprisonment authorized by § 53a-35a shall sentence such person to a term of imprisonment of not more than forty years. See also Nev. Rev. Stat. § 207.010 (2) (2005) (vesting court with discretion to dismiss persistent offender count). Alternatively, the legislature could have referred specifically to these considerations solely as mitigating factors, as it did when using a similar phrase in the mitigation portion of our death penalty scheme. See General Statutes § 53a-46a (d).[34]

At the same time, however, we are mindful that the statute refers first to the jury's finding—"[w]hen any person has been *found* to be a persistent dangerous

---

[34] General Statutes § 53a-46a (d) provides: "In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death."

felony offender"—and then refers to the court's *"opinion"* that the enhanced sentence is in the public's interest. (Emphasis added.) General Statutes § 53a-40 (h). As a general rule, "[t]he use of . . . different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . ." (Internal quotation marks omitted.) *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 521, 923 A.2d 638 (2007). Although we previously have not construed the phrase "the court is of the opinion," we note that variations of this phrase are used in several of the General Statutes.[35] What we can glean from its use is that it typically is employed in situations wherein trial courts historically have exercised reasoned judgment to make a determination that requires the consideration of various facts. See, e.g., General Statutes § 54-82f ("[i]f the judge before whom the [voir dire] examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines").

The Supreme Court's decisions subsequent to *Apprendi*, however, are instructive when considering the effect of discretionary authority. The mere fact that the statute may permit the court to exercise discretion in

---

[35] See General Statutes § 53a-29 (conditional discharge or probation for nonclass A felony); General Statutes § 53a-34 (unconditional discharge); General Statutes § 53a-40a (persistent offenders of crimes involving bigotry or bias); General Statutes § 53a-40d (persistent offender of crimes involving assault, stalking, trespass, threatening, harassment or criminal violation of protective order or restraining order); General Statutes § 53a-40e (standing criminal restraining order); General Statutes § 53a-40f (persistent offender while under influence felony offender); General Statutes § 53a-300 (enhanced sentence for act of terrorism); General Statutes § 54-73 (collection and disposition of forfeitures); General Statutes § 54-82b (right to trial by jury after waiver); General Statutes § 54-82f (excusing juror after voir dire).

deciding on what particular facts it will rely in making its public interest determination would not insulate the statute from constitutional infirmity if it permits the trial court's ultimate finding to subject the defendant to a higher sentence than that authorized by the jury's verdict. See *Cunningham* v. *California*, supra, 549 U.S. 290; *Blakely* v. *Washington*, supra, 542 U.S. 305. These decisions also make clear that, if its ultimate finding subjects the defendant to a higher sentence than authorized by the jury's verdict, it is immaterial whether the sentencing court is being called on to consider the type of facts that courts historically have weighed when otherwise exercising discretion in determining an appropriate sentence within a prescribed range. See *Cunningham* v. *California*, supra, 289; *United States* v. *Booker*, supra, 543 U.S. 235–36; *Ring* v. *Arizona*, supra, 536 U.S. 604–606. Indeed, under the California scheme struck down in *Cunningham*, among the aggravating " 'facts relating to the defendant' " that the trial court could have considered were factors that readily could be so characterized and that neatly would fall within the court's public interest determination in our scheme.[36] See *Cunningham* v. *California*, supra, 278.

Finally, we note that the legislature prescribed in subsection (h) of § 53a-40 that the court "*shall*" impose the enhanced sentence after making its public interest determination. (Emphasis added.) By contrast, in other

---

[36] Rule 4.421 (b) of the California Rules of Court provides: "Facts relating to the defendant, include the fact that:

"(1) The defendant has engaged in violent conduct that indicates a serious danger to society;

"(2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness;

"(3) The defendant has served a prior prison term;

"(4) The defendant was on probation or parole when the crime was committed; and

"(5) The defendant's prior performance on probation or parole was unsatisfactory."

subsections of § 53a-40 addressing nondangerous persistent offenders, the legislature provided that the court *"may* impose" the enhanced sentence after making that determination. (Emphasis added.) See General Statutes § 53a-40 (j), (k), (*l*) and (m). Thus, the statute provides in clear terms that, once the court makes its public interest determination under § 53a-40 (h), it has no discretion to decide whether to impose the enhanced sentence. See *State* v. *Bletsch*, 281 Conn. 5, 17, 912 A.2d 992 (2007) ("as opposed to [d]efinitive words, such as must or shall, [which] ordinarily express legislative mandates of a nondirectory nature . . . the word may imports permissive conduct and the conferral of discretion" [citation omitted; internal quotation marks omitted]). Accordingly, there is no linguistic basis on which to conclude that the jury's persistent offender finding alone subjects the defendant to the enhanced sentence, and that the statute merely vests the court with discretion either to decide whether extended incarceration will best serve the public interest or to decide whether to sentence the defendant as a persistent offender after making the public interest determination. Therefore, when read as a whole, the language of § 53a-40 (h) appears to authorize, and in fact mandate, that the court impose the enhanced sentence only after the jury has made one predicate finding and the court makes the second predicate finding.

Indeed, this court previously has interpreted § 53a-40 as prescribing two factual predicates to imposition of the enhanced sentence. In *State* v. *Velasco*, 253 Conn. 210, 218, 751 A.2d 800 (2000), a case decided before *Apprendi*, we considered whether another sentence enhancement statute, § 53-202k, permitted the court, rather than the jury, to make the necessary finding that the defendant had used a firearm in the commission of a class A, B or C felony. In comparing that statute to § 53a-40 and other statutes, the court observed: "[O]ther

statutes expressly designate when a factual determination is to be made by a judge. For example, the persistent offender statutes permit the imposition of an enhanced penalty [w]hen any person [is] found to be a persistent . . . offender, and *the court is of the opinion* that his history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration will best serve the public interest . . . . General Statutes § 53a-40 (f) through (i). The statute thereby identifies those facts that must be evaluated by the court, once the jury finds the triggering fact, that is, a prior conviction. . . . We are persuaded that the grant of authority under these statutes for fact-finding by a sentencing judge is indicative of the legislature's understanding that, except in limited circumstances, the determination of ultimate facts remains the exclusive function of the jury." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Velasco*, supra, 227–28.

Although *Velasco* referred to the jury's finding as the "triggering fact"; id., 228; we do not construe this reference, when read in context, to suggest that the jury's finding would be the sole determinative factor of whether an enhanced sentence could be imposed. Rather, the prior conviction appears to be the triggering fact in the same sense that our death penalty scheme provides that certain facts make an offense death penalty eligible; see General Statutes § 53a-54b (enumerating capital felonies); and then requires that an additional fact—an aggravating fact—be found by the jury beyond a reasonable doubt before the death penalty actually may be imposed. General Statutes § 53a-46a (f) and (i). Indeed, as *Velasco* makes clear, § 53a-40 contemplates judicial fact-finding before the enhanced sentence can be imposed. See *State* v. *Velasco*, supra, 253 Conn. 227–28.

The genealogy and legislative history to § 53a-40 support the conclusion that the public interest determination is, as we stated in *Velasco*, an ultimate factual predicate to the imposition of a mandatory enhanced sentence. The predecessor statutes to § 53a-40 originally had mandated an enhanced sentence solely based on the fact of prior convictions. See General Statutes (1918 Rev.) § 6660; General Statutes (1949 Rev.) § 8825; General Statutes (1958 Rev.) § 54-121.[37] In 1969, when enacting the Penal Code; Public Acts 1969, No. 828; the legislature: created the persistent offender statute to distinguish different categories of offenders on the basis of their relative dangerousness; added the trial court's public interest determination; and provided that, upon making this determination, the court "may impose" a maximum sentence of life imprisonment, just as for a class A felony. Public Acts 1969, No. 828, § 40; see General Statutes (1969 Sup.) § 53a-40. There is no legislative history to explain the procedure under which the public interest determination was to come into play, and the comment to the Penal Code simply provides: "The consequence of being found to be a persistent dangerous felony offender is that the court may, under [§ 53a-40 (h)], impose a life sentence as for a class A felony. Whether to do so is a matter left to the discretion of the court." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 2001) § 53a-40, comments, p. 409.

In 1994, the legislature amended then § 53a-40 (f) (now § 53a-40 [h]) to, inter alia, substitute the manda-

---

[37] General Statutes (1958 Rev.) § 54-121 is, for all intents and purposes, the same as its predecessors and provides in relevant part with respect to offenses other than those punishable by life imprisonment or death: "The maximum term shall not be longer than the maximum term of imprisonment prescribed by law as a penalty for such offense, and the minimum term shall not be less than one year; provided, when any person so sentenced has twice before been convicted, sentenced and imprisoned in a state prison or penitentiary, the court shall sentence such person to a maximum of thirty years . . . ."

tory "shall impose" language for the discretionary "may impose" language.[38] See Public Acts 1994, No. 94-37, § 1. Representative Dale W. Radcliffe, a sponsor of the amendment making this specific change to proposed House Bill No. 5385, the bill that later was enacted as part of the 1994 Public Act, explained the changes to the sentencing procedure as follows: "Now under [the persistent felony offender statute] *the court, before any of these sentences can be imposed, has to make a finding* and the state has to prove that the nature and circumstances of the criminal conduct indicate that incarceration and lifetime supervision will best serve the public interest. So that's where your discretion comes in.

*"The court has to make a finding.* It has to be proven beyond a reasonable doubt that lifetime incarceration will best serve the public interest. *Then you get to the second section.* Well, having had that discretion in the initial section, having overcome that extremely high burden of proof beyond a reasonable doubt, it seems only reasonable to say that a court shall impose certain sentences . . . a term of not more than [forty] years if [the defendant has] been twice convicted, and . . . not more than life in the event of a third conviction." (Emphasis added.) 37 H.R. Proc., Pt. 8, 1994 Sess., pp. 2879–80.

In sum, the language and history of the statute support the conclusion that § 53a-40 (h) requires two factual predicates before an enhanced sentence may be

---

[38] Public Acts 1994, No. 94-37, § 1, also amended then § 53a-40 (f) by substituting for the language that permitted the court to impose a sentence of life imprisonment otherwise authorized for a class A felony: (1) language that required the court to impose a term of imprisonment of not more than forty years if the defendant had one prior conviction for the crimes enumerated; and (2) language that required the court to sentence such person to a term of imprisonment of not more than life if such person had been twice convicted and imprisoned for any of the crimes enumerated in § 53a-40 (a) (2).

imposed—a jury determination that the defendant meets the definition of a persistent offender by virtue of his prior convictions, and a trial court determination that extended incarceration will best serve the public interest, given the defendant's history and character and the nature of the offenses. Accordingly, in violation of *Apprendi*, "the required finding expose[d] the defendant to a greater punishment than that authorized by the jury's guilty verdict . . . ." *Apprendi* v. *New Jersey*, supra, 530 U.S. 494.

The Ninth Circuit Court of Appeals' decision in *Kaua* v. *Frank*, 436 F.3d 1057, 1058 (9th Cir. 2006), cert. denied, 549 U.S. 1245, 127 S. Ct. 1233, 167 L. Ed. 2d 144 (2007), holding that Hawaii's persistent offender statute violates *Apprendi*, supports our conclusion. The Hawaii statute "provides for an extended sentence if '[t]he defendant is a multiple offender whose criminal actions were so extensive that a sentence of imprisonment for an extended term is necessary for the protection of the public.' " Id., quoting Haw. Rev. Stat. § 706-662 (4) (1993). The Ninth Circuit noted that the Hawaii Supreme Court consistently had construed its statute to require the sentencing court to apply a two step process: first, determining whether the defendant had the requisite prior convictions; and second, determining whether an extended sentence is necessary for the protection of the public. *Kaua* v. *Frank*, supra, 1059. Given that this second determination was made by the court, not by the jury beyond a reasonable doubt, the Ninth Circuit concluded that the statute violated *Apprendi*. Id., 1062. In so concluding, the Ninth Circuit rejected the Hawaii Supreme Court's reasoning that this process does not violate *Apprendi* because the public interest determination requires the court to consider facts " 'extrinsic,' " or collateral, to the offense, rather than those " 'intrinsic,' " or elemental, to the offense. Id., 1061–62. The Ninth Circuit underscored that the rele-

vant determination under *Apprendi* is one of effect, not form. Id.; see also, e.g., *State* v. *Schofield*, 895 A.2d 927, 931–33 (Me. 2005) (concluding that sentence enhancement based on court's finding regarding " 'nature and seriousness of the crime coupled with the serious criminal history of the defendant' " violates *Blakely*); *State* v. *Fairbanks*, 688 N.W.2d 333, 336–37 (Minn. App. 2004) (concluding that dangerous persistent offender statute, which permitted sentence enhancement if defendant had two or more convictions for violent crimes and court finds defendant to be " 'a danger to public safety,' " violates *Blakely*); *State* v. *Thomas*, 188 N.J. 137, 152–54, 902 A.2d 1185 (2006) (concluding that sentence enhancement based on court's finding of aggravating factor relating to risk that defendant would reoffend based on his criminal history violates *Apprendi*).

The state nonetheless contends that the court's determination under § 53a-40 (h) that the defendant's "history and character and the nature and circumstances of [his] criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest" does not contravene *Apprendi*. It contends that, "while subsection (h) mandates the trial court's assessment of these considerations, it does not call for, or enumerate, any specific subordinate factual findings that would serve as a predicate for the ultimate determination that enhanced sentencing is in the best interest of the public." It further contends that the court's determination is of a different ilk than those at issue in the *Apprendi* line of cases. In support thereof, the state points to *Brown* v. *Greiner*, 409 F.3d 523, 535 (2d Cir. 2003), and *People* v. *Rivera*, 5 N.Y.3d 61, 67–68, 833 N.E.2d 194, 800 N.Y.S.2d 51, cert. denied, 546 U.S. 984, 126 S. Ct. 564, 163 L. Ed. 2d 473 (2005), wherein the Second Circuit Court of Appeals and the New York Court of Appeals, respectively, concluded that the New

York courts' application of that state's persistent offender statute, which bears substantial similarities to our scheme, did not violate *Apprendi*. We reject the state's contentions.

We note at the outset that the New York persistent offender scheme is, for purposes of the issue before us, substantially similar to § 53a-40 (a) and (h), in that it vests the court with discretion to impose an enhanced sentence after making a persistent offender finding based on prior convictions "when [the court] is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest . . . ." N.Y. Penal Law § 70.10 (2) (McKinney 2004).[39] We disagree, however, that the reasoning of the two cases on which the states relies counsels against our conclusion.

In *Brown* v. *Greiner*, supra, 409 F.3d 526, the Second Circuit considered the limited question, raised in three habeas corpus petitions, of whether state court decisions affirming the defendants' sentences under the

---

[39] Section 70.10 of the New York Penal Law (McKinney 2004), entitled "Sentence of imprisonment for persistent felony offender," provides in relevant part:

"1. Definition of persistent felony offender.

"(a) A persistent felony offender is a person, other than a persistent violent felony offender as defined in section 70.08, who stands convicted of a felony after having previously been convicted of two or more felonies, as provided in paragraphs (b) and (c) of this subdivision. . . .

"2. Authorized sentence. When the court has found, pursuant to the provisions of the criminal procedure law, that a person is a persistent felony offender, and when it is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest, the court, in lieu of imposing the sentence of imprisonment authorized by section 70.00, 70.02, 70.04 or 70.06 for the crime of which such person presently stands convicted, may impose the sentence of imprisonment authorized by that section for a class A-I felony. In such event the reasons for the court's opinion shall be set forth in the record."

persistent offender statute were "contrary to, or . . . an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States?" (Internal quotation marks omitted.) The Second Circuit underscored that the *only* established law at the time the state courts had rendered their decisions was *Apprendi.* Id., 533–34 and n.3. Thus, in the absence of *Blakely, Booker* and *Cunningham,* it is not surprising that the Second Circuit concluded that it had not been *unreasonable* for the state courts to interpret *Apprendi* as permitting the sentencing courts to decide whether extended incarceration was in the public interest—a clearly more "vague, amorphous assessment" than the type of racial motive finding at issue in *Apprendi.*[40] Id., 534. As we previously have explained herein, these subsequent cases rejected the proposition that a scheme avoids the *Apprendi* problem

---

[40] The state's contention that § 53a-40 (h) calls for amorphous assessments that are not of the ilk of the facts at issue in *Apprendi* and its progeny is not entirely accurate. In *Blakely* v. *Washington,* supra, 542 U.S. 300, 305, the Supreme Court concluded that the trial court impermissibly had increased the defendant's sentence on the basis of the court's finding that the following aggravating factor existed—that the defendant had acted with "deliberate cruelty." This court previously has concluded that a similar aggravating factor under our death penalty scheme—that "the defendant committed the offense in an especially heinous, cruel or depraved manner"; General Statutes § 53a-46a (i) (4);—contains an arguably subjective standard that ran the risk of being unconstitutionally vague. See *State* v. *Breton,* 212 Conn. 258, 265, 562 A.2d 1060 (1989). To avoid constitutional jeopardy for this aggravating factor, we adopted a limiting construction of that statutory language. Id. Thus, an aggravating sentencing factor may be vague, and thus require further delineation, but yet still constitute a factual determination for the jury.

To that end, however, we note that, in the present case, the trial court's statements prior to imposing sentence reflect that it found specific facts in support of its ultimate finding that extended incarceration would best serve the public interest. The court found that the defendant's conduct could have resulted in a more serious conviction than first degree assault because Fumiatti nearly had died from his gunshot wound. The court also found that the defendant's uninterrupted criminal history made it almost certain that he would reoffend as soon as he was released. We see nothing vague or amorphous about such findings.

if it vests the court with discretion either to rely on any factor it deems relevant or to consider the type of more open-ended considerations that sentencing courts historically have considered. See *Cunningham* v. *California*, supra, 549 U.S. 288–93; *United States* v. *Booker*, supra, 543 U.S. 235–36; *Blakely* v. *Washington*, supra, 542 U.S. 305; *Ring* v. *Arizona*, supra, 536 U.S. 604–606. Thus, *Brown* does not dictate a contrary result in the present case.

In *People* v. *Rivera*, supra, 5 N.Y.3d 67–68, the New York Court of Appeals concluded that its persistent offender statute satisfied the *Apprendi* line of cases through *Booker*. Significantly, the majority in *Rivera* stated that it previously had construed the New York statute to require that the "predicate felonies [were] the 'sole' determinant" as to whether the defendant's sentence could be enhanced. Id., 68; see also id., 67 (referring to court's earlier decision). In light of that construction, the majority unsurprisingly reasoned that the trial court's public interest determination did not violate *Apprendi*. Id., 68. In two dissenting opinions, two judges contended that the majority had construed the statute in disregard of its language. See id., 72–73 (Kaye, C. J., dissenting) ("I agree that the statutory scheme the [c]ourt describes would pass constitutional muster. The problem, though, is that the statute construed by the majority was not before today the law in New York. The language of the statute is plain, and reflects the intent of the [l]egislature, that not every two-time [nonviolent] offender recidivist is eligible, without more, to be sentenced to an indeterminate life term."); id., 76 (Ciparick, J., dissenting) ("[i]n essence, the majority has rewritten the statute"). Although we tend to agree with the dissenters that the majority in *Rivera* offered no linguistic or extratextual support for its construction of the statute, irrespective of our disagreement with that construction, the majority's construction

of the New York statute places it squarely outside the *Apprendi* proscription. As such, its reasoning is irrelevant given our contrary interpretation of our statute as set forth in this opinion.

Finally, we reject the state's contention that the trial court's public interest determination is merely cumulative of facts subsumed within the jury's persistent offender finding. We agree with the reasoning of the New Jersey Supreme Court, which rejected a related claim. In *State* v. *Thomas*, supra, 188 N.J. 137, the New Jersey court considered whether allowing a court to enhance a sentence based on three statutory aggravating factors addressing the risk of recidivism was a violation of *Apprendi*. Those factors were: "[t]he risk that the defendant will commit another offense . . . [t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted . . . [and] [t]he need for deterring the defendant and others from violating the law . . . ." N.J. Stat. Ann. § 2C:44-1 (a) (3), (6) and (9) (West 2005). The state had argued that "it is permissible for a sentencing court to find those aggravating factors as derivative of finding the fact of a prior conviction"; *State* v. *Thomas*, supra, 149; the lone fact to fall outside the *Apprendi* rule. The court rejected that proposition, first noting, as a practical matter, that sentencing records did not indicate that trial courts had found such aggravating factors solely on the basis of the fact of the prior conviction. Id., 152. The New Jersey Supreme Court further reasoned that courts should not be limited to that fact when considering these aggravating factors. Id., 153. We agree.

For similar reasons, we reject the state's claim that the error in the present case was harmless. In considering an analogous claim—whether it was harmless error for the trial court to fail to instruct the jury on an essential element of another sentence enhancement

statute, § 53-202k, namely, whether the defendant had used a firearm in the commission of the underlying offense—we stated: "[A] jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . . [*Neder* v. *United States*, 527 U.S. 1, 17, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)]; accord *State* v. *Velasco*, supra, 253 Conn. 232; see also *State* v. *Faust*, 237 Conn. 454, 469, 678 A.2d 910 (1996). . . . Because the defendant did not dispute the fact that the victim's fatal wounds were inflicted by a firearm, and because the jury found beyond a reasonable doubt that the defendant was guilty of the victim's murder, a class A felony, the trial court's failure to instruct the jury regarding the elements of § 53-202k was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Montgomery*, supra, 254 Conn. 738.

By contrast, the jury's finding of guilt in the present case and its finding of the defendant's prior robbery conviction did not necessarily encompass a finding that extended incarceration would best serve the public interest. Although we agree with the state that there was ample evidence in the record to support the trial court's conclusion, the jury did not hear that evidence. Thus, we cannot agree that a jury, as a matter of law, would have been compelled to make that finding.

We therefore conclude that § 53a-40 (h) is unconstitutional, to the extent that it does not provide that a defendant is entitled to have the jury make a "required finding [that] expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict . . . ." *Apprendi* v. *New Jersey*, supra, 530 U.S. 494. With respect to the appropriate remedy, "[w]e seek to

determine what [the legislature] would have intended in light of the [c]ourt's constitutional holding." (Internal quotation marks omitted.) *United States* v. *Booker*, supra, 543 U.S. 246. Thus, "[g]uiding the solution is the maxim that this court will strive to interpret a statute so as to sustain its validity, and give effect to the intention of the legislature. . . . By General Statutes § 1-3 the legislature has shown its intention that there is to be a presumption of separability of the provisions and of the applications of statutes. . . . With regard to the separability of provisions, to overcome the presumption it must be shown that the portion declared invalid is so mutually connected and dependent on the remainder of the statute as to indicate an intent that they should stand or fall together . . . and this interdependence would warrant a belief that the legislature would not have adopted the remainder of the statute independently of the invalid portion." (Citations omitted.) *State* v. *Menillo*, 171 Conn. 141, 145, 368 A.2d 136 (1976); see also *State* v. *Somerville*, 214 Conn. 378, 386, 572 A.2d 944 (1990) (citing court's authority to excise offending phrase from statute).

Undoubtedly, if the phrase "the court is of the opinion that" was excised, § 53a-40 (h) would avoid the *Apprendi* problem.[41] In the absence of this phrase, our well established case law regarding factual findings in sentence enhancements, dating back as far as 1921, would control. Under that case law, "the task of determining the existence of a designated fact that might compel the imposition of a sentencing term beyond that otherwise applicable to the underlying crime . . . falls upon the jury." *State* v. *Velasco*, supra, 253 Conn. 223, and cases

---

[41] We note that the defendant in the present case asserted at oral argument before this court that his constitutional challenge to § 53a-40 (h) is as the statute was applied to him. Neither party claimed that, if we conclude that subsection (h) is constitutionally deficient, we should strike down the entire statute, nor did either suggest that any other remedy should be provided.

cited therein. The question, therefore, is whether the legislature would have adopted the statute without the requirement that *the court* make the requisite public interest finding. Given the overwhelming evidence in the legislative history to the 1994 amendment to § 53a-40 that the legislature's intent was to keep those violent, persistent offenders who were most likely to reoffend and put the public at risk off the streets for an extended period; see, e.g., 37 H.R. Proc., supra, pp. 2837–39, remarks of Representative Steven Mikutel; we conclude that the remaining portion of the statute can operate independently and effectively to achieve that intent.

Accordingly, to remedy the *Apprendi* violation, we excise the language that gives rise to the violation. See, e.g., *United States* v. *Booker*, supra, 543 U.S. 245 (excising offending provisions); *Smylie* v. *State*, 823 N.E.2d 679, 685–86 (Ind.) (excising requirement that court make finding), cert. denied, 546 U.S. 976, 126 S. Ct. 545, 163 L. Ed. 2d 459 (2005), superseded by statute as stated in *Anglemyer* v. *State*, 868 N.E.2d 482, 489 (Ind. 2007); *State* v. *Shattuck*, 704 N.W.2d 131, 144 (Minn. 2005) (excising part of guideline section that allows upward departure on basis of court's findings); *State* v. *Foster*, 109 Ohio St. 3d 1, 29–30, 845 N.E.2d 470 (2006) (excising offending provisions). Of course, in those cases in which the defendant chooses to waive his right to a jury trial under § 53a-40, the court may continue to make the requisite finding. Additionally, the court properly may impose an enhanced sentence if the defendant admits to the fact that extended incarceration is in the public interest. In the present case, however, the defendant did not make such a waiver, nor did he admit to the pertinent fact. He, therefore, is entitled to a new sentencing proceeding wherein the jury shall make the determination, beyond a reasonable doubt, whether, upon consideration of the relevant factors under § 53a-

40 (h), extended incarceration will best serve the public interest.

The judgment of conviction is reversed only as to the sentence imposed and the case is remanded for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.